UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

Hearing Date and Time:
January 27, 2026 at 10:00 a.m.

------------------------------------------------------------x

In re:                                                                          Chapter 11

Dynamic Star LLC,                                              Case No. 25-21354-SHL

                         Debtor.

------------------------------------------------------------x

In re:                                                                          Chapter 11

DS 1 GP Inc.,                                                     Case No. 25-21355-SHL

                         Debtor.

------------------------------------------------------------x

In re:                                                                          Chapter 11

Fordham Landing Preferred Sponsor LLC,          Case No. 25-21356-SHL

                         Debtor.

------------------------------------------------------------x

In re:                                                                          Chapter 11

Fordham Landing Preferred LLC,                         Case No. 25-21357-SHL

                         Debtor.

------------------------------------------------------------x

## DEBTORS' CONSOLIDATED OPPOSITION TO THE
## RESPECTIVE MOTIONS TO DISMISS THE CHAPTER 11 CASES

The respective Debtors herein, Dynamic Star LLC ("Dynamic"), DS 1 GP Inc. ("DS 1")[1],

Fordham Landing Preferred Sponsor LLC ("Fordham Sponsor"), Fordham Landing Preferred LLC

("Fordham Preferred")[2] (collectively, the "Debtors"), by their undersigned counsel, respectfully

submit this Consolidated Opposition to the respective motions (the "Motions") filed by two note

---

[1] Dynamic Star and DS 1 are the Class A members in Fordham South (which owns the development site at 320 West Fordham Road) and are referred to as the "Fordham South Debtors".
[2] Fordham Sponsor and Fordham Preferred are the direct and indirect members in Fordham North (which owns the development site in the neighboring vicinity on three parcels spread out over 14 acres) and are referred to as the "Fordham North Debtors".

1

buyers, Fordham North Preferred Investor LLC ("F/N Lender") and Fordham South Lender LLC

("F/S Lender"), affiliates of a private Brooklyn real estate company known as Cremac (hereinafter

jointly, the "Cremac Lenders"), and a highly subversive and disloyal co-joint venturer/partner, Igal

Namdar ("Namdar") and his affiliated company, Namdar Fordham South LLC ("Namdar Fordham

South") all seeking to dismiss the Chapter 11 cases based upon highly dubious grounds, regarding

the alleged lack of corporate authority and purported lack of good faith.  For the reasons set forth

below, the Motions should be set down for evidentiary hearings, if not denied outright.

**Preliminary Statement**

1.      The matters presented by these Motions implicate highly complex factual and legal

issues which require extensive briefing and the development of a complete evidentiary record.  The

immediate factual disputes relate not only to the Debtors' overall ability to successfully reorganize

based upon construction of two large scale and separate affordable housing complexes, but the

unholy alliance between the Cremac Lenders and Namdar, who are now conspiring together to

cause the forfeiture of the Debtors' potentially very valuable property rights.  One would logically

expect that if Namdar was a true good faith equity member, he would align himself with the

Debtors and his partners to preserve asset values.  That Namdar shows absolutely no inclination

to do so (and is, in fact, working against the Debtors) speaks volumes that a hidden agenda is in

play.

2.      The Debtors hope to be afforded the opportunity to develop a more fulsome record

establishing Namdar's underhanded tactics, and were disappointed that their request for a

relatively brief adjournment was denied due to the lack of consent from the Movants.  Namdar's

failings to honor his good faith obligations owed to the Debtors are pervasive, beginning with his

failure to make required capital calls in late 2024 to extend the mortgage debt on Fordham North,

and continuing with his surreptitious participation (directly or indirectly) in 2025 to acquire the underlying debt in conjunction with the Cremac Lenders as a means to eliminate the Debtors and Dynamic from further involvement in the projects despite their total investments of $30 million.

3.      Given the narrow time frame, the Debtors are submitting this Opposition on a consolidated (albeit preliminary basis) for filing in each of the Chapter 11 cases to highlight the prime areas in dispute (both factually and legally) and to establish the framework for a viable reorganization path forward for each project.  Further fact finding is absolutely essential to unmask the true link between Namdar and the Cremac Lenders that implicates a myriad of claims, counterclaims and cross claims for breach of fiduciary duty, tortious interference of contract, breach of contract and failure to abide by the duty of good faith and fair dealing.  These claims have been raised in defense of a foreclosure action relating to Fordham North which is currently pending (Supreme Court, New York County, Index No. 850030-2025).

4.      The Debtors respectfully request that the Court exercise its authority under Local Rule 9014-2 to schedule a full evidentiary hearing and utilize Tuesday's appearance as a preliminary hearing to crystalize the issues for discovery and trial.

### (A) The Debtors are Acting in Good Faith and With Proper Authority

5.      Contrary to the Motions, each of the petitions was filed in the utmost good faith. The respective Fordham South and Fordham North projects (although at different stages) pass the Second Circuit's C-TC standards, particularly when analyzed in a holistic manner based upon the upcoming Chapter 11 filings for the actual fee owner entities.  Movants have not and cannot establish that the Debtors lack either the intent to reorganize or a reasonable possibility of doing so without properly addressing the current status of each project.  This is ignored in the Motions and creates a gaping hole in the record.

6.      Far from futile, after years of efforts, the Debtors are (i) standing on the brink of completing a comprehensive municipal financing with City and State agencies relating to the Fordham South project which can close as early as mid-2026 all allow prompt construction of a 983 unit state of the art affordable housing complex; and (ii) have cleared years of environmental hurdles, allowing the Fordham North entities to proceed with a merger and rezoning of the three contiguous properties into one large development site.  To be sure, redevelopment projects of this size are highly complex, but the point to emphasize is that the initial filings are stepping stones to additional proceedings to be shortly filed before the Court involving the four fee owners themselves: (a) Fordham South – DS Fordham Landing I LLC; and (b) Fordham North – DS Fordham Landing 2 LLC (2371 Exterior Street), MDBZJGGS LLC (301 West Fordham Road) and DS Fordham Landing 4 LLC (2391 & 2401 Exterior Street).  The combination of all of the Chapter 11 cases will provide the Court with jurisdiction over a fully integrated set of business projects that have gained added momentum because of the new Mayor's agenda in promoting affordable housing in New York City.

**(B)      Namdar Does Not Hold Veto Rights to Prevent the Chapter 11 Filings**

7.      On November 26, 2025, a formal meeting of the Management Committee was called for December 1, 2025 pursuant to the attached notice annexed hereto as <u>Exhibit</u> "A". Namdar elected not to attend this meeting without any legitimate explanation, other than a desire to stonewall efforts to preserve the projects against forfeiture.  The meeting led to the resolutions authorizing the commencement of these Chapter 11 cases, which should be recognized as a valid exercise of authority.  Any ensuing arguments that the Fordham North Debtors lack appropriate authority is flawed in multiple respects.  <u>First</u>, while Namdar is a member of the Management Committee, and has the right to vote on all Major Decisions as defined by the Fordham Sponsor

4

Operating Agreement (the "Sponsor OA"), he cannot purposely absent himself from participating under his covenant of good faith.  Indeed, the Debtors were certainly not oblivious to the approaching UCC auction sale on December 2, 2025 and sought out Namdar, who by that time was universally viewed as effectively controlling the mortgages and the timing of the auctions.

8.    Only after negotiations proved unsuccessful did the Debtors notice and conduct the emergency meeting on December 1, 2025 on five (5) calendar days' notice.  Under the circumstances, Namdar's insistence on receiving five (5) business days' notice (as opposed to five (5) calendar days) is overly formulistic and does not create disabling jurisdictional deficiencies as a matter of law.

9.    Moreover, while Namdar quibbles over the Debtors' notice, his rejection through counsel does not conform to the requirements of the Sponsor OA, a copy of which is annexed hereto as Exhibit "B".  The rejection was not signed by Namdar and was sent by email from his attorney.  Under the Sponsor OA, only the actual representatives themselves can call a meeting of the Management Committee (See, Exhibit "B", Section 9.2(c)) ["The Management Committee shall meet at such times as may be necessary for the conduct of the Management Committee's business on at least five (5) Business Days prior written notice of the time and place of such meeting given by any Representative to all of the other Representatives."].  Because only the actual representatives can call a meeting, it follows then that only the actual representatives can reject a meeting notice and Namdar cannot act by or through surrogates.  In other words, Namdar cannot seek to hold the Fordham North Debtors to strict compliance with the Sponsor OA without demonstrating strict compliance on his end.

10.    At bottom, however, Namdar's refusal and failure to participate in the December 1, 2025 meeting was done in bad faith without any legitimate reason for not attending or voting to

5

attempt to stay the UCC auction sale.  Namdar's actions violated Section 9.2(i) of the Sponsor OA,

which imposes good faith requirements upon all representatives on the Management Committee:

> . . . Notwithstanding any duty (including any fiduciary duty) that might otherwise
> exist at law or in equity, the duty of care of each of such Representatives (in their
> capacities as members of the Management Committee only), the Manager and the
> Members is to act in good faith and to not act with fraud, intentional misconduct or
> a knowing and culpable violation of law . . . .

11.     Yet, even if Namdar's appearance is deemed necessary for a quorum, the business

of the Fordham North Debtors does not necessarily end.  The Sponsor OA further provides the

ability to reschedule the meeting under Section 9.2(d) thereof, at which time the Namdar

representative must appear or, failing which, the Dynamic representative (Gary Segal) can then

act independently of Namdar.  To this effect, Section 9.2(d) provides in relevant part:

> . . . If any meeting of the Management Committee shall fail to achieve a quorum by
> reason of the absence of the Namdar Representative, then the Dynamic
> Representative may adjourn such meeting and provide notice to Namdar that such
> adjourned meeting has been rescheduled for a date not less than three (3) Business
> Days following such adjourned meeting. If the rescheduled meeting of the
> Management Committee shall fail to achieve a quorum by reason of the absence of
> the Namdar Representative, then, notwithstanding the first sentence of this
> paragraph, the rescheduled meeting shall be deemed to have achieved a quorum
> and no further vote by any Namdar Representative shall be required to approve any
> action presented to the Management Committee during such rescheduled meeting
> . . . .

Accordingly, the Debtors have the ability, if necessary, to ratify the commencement of the Chapter

11 cases by the Fordham North Debtors without Namdar's participation, through a continuation of

the December 1, 2025 meeting.

12.     Finally, even if Namdar had attended the December 1, 2025 meeting, it assuredly

would have ended in a "deadlock" under Section 9.2(f) of the Sponsor OA.  Yet, there is nothing

under the Sponsor OA to indicate that the existence of a deadlock causes the business of Fordham

Sponsor to come to a screeching halt.  Instead, a deadlock triggers certain potential buy-out rights

which can be invoked by either representative in addition to any other rights and remedies at law or equity, including the right of the Dynamic Representatives to seek to expel Namdar under state law, which is now in progress.  The reality is that, given his history of self-dealing, Namdar was never going to consent to the commencement of bankruptcy proceedings whether he received five business days' notice, five weeks' notice or even five months' notice.

13.     Case in point of Namdar's subsequent refusal to participate in a second Management Committee meeting called to authorize the commencement of Chapter 11 cases for the Fordham North fee owners pursuant to the attached notice dated January 6, 2026, a copy of which is annexed hereto as Exhibit "C".  Namdar again absented himself, and designated his Executive Vice President to attend, who then refused to consent to the commencement of a Chapter 11 case without explanation, rationale or comment, except to note that the parties are in litigation.

14.     Namdar's attorneys then declined to engage in any further discussions and waived the ensuing ten (10) day period under Section 9.2(f) of the Sponsor OA to pursue good faith discussions.  Given this intemperance, the Dynamic Representatives have responded with the issuance of a Notice of Expulsion (attached hereto as Exhibit "D") contemporaneously herewith to negate Namar's ability to further stonewall efforts at reorganization.

15.     All of Namdar's actions or inactions must be closely examined for purposes of the Motions, particularly in light of a highly damning privilege log obtained in the context of the pending foreclosure litigation referenced above.  The privilege log, a copy of which is annexed hereto as Exhibit "E", references prior emails exchanged by and among Namdar, his attorneys (Herrick Feinstein), the Cremac Lenders, and its principal, Joseph Cafiero, under the subject line of "Legal Guidance re: Note Acquisition".  The emails are dated February 27, 2025 and February 28, 2025, respectively, creating clear evidence that Namdar and Cafiero (and to the exclusion of

7

the Dynamic Representatives) were indeed in direct discussions about purchasing mortgages <u>on the very same day</u> (February 28, 2025) that F/N Lender executed the assignment to acquire the existing first mortgage on the Fordham North project from Rialto/Blackstone (*See,* Notice of Assignment filed with the City Register, Bronx County, annexed hereto as <u>Exhibit</u> "F").

16.    Shortly thereafter, another set of Cremac entities (presumably also acting at Namdar's behest) acquired the senior mortgage debt encumbering Fordham South, and a mezzanine loan with respect to Fordham North, both previously held by affiliates of Columbia Pacific (*See,* Notice of Assignment filed with the City Register, Bronx County on or about June 26, 2025, annexed hereto as <u>Exhibit</u> "G").

17.    The emergence of Joseph Cafiero on the scene on behalf of Cremac is curious to say the least.  Joseph Cafiero, while affiliated with Cremac, does not appear to be a lender by trade, and instead he recently received the ignominious distinction of being named the fourth worst landlord in New York City based on the 2025 Landlord Watchlist, a copy of which is annexed hereto as <u>Exhibit</u> "H".  According to the Watchlist, Mr. Cafiero's 19 buildings are subject to 2871 HPD violations.  How Mr. Cafiero went from a shunned and vilified landlord to the holder of tens of millions of dollars in mortgage debt lends support to the core contention that Mr. Cafiero is nothing more than a shill to do Namdar's bidding.

### (C)   Current Status of the Respective Projects

18.    A review of the current status of each project will assist the Court in assessing the progress which has been made and fully appreciate the Debtors' respective ability to reorganize going forward, with Fordham South expected to close on a large municipal financing this year.

**(1) Fordham South**

19.     The Fordham South project is located at 330 West Fordham Road on a four-acre site adjacent to a Metro North Train Station.  The property was acquired before Covid-19 by the Dynamic Representatives, Gary Segal and his partner Brad Zackson, who subsequently elected to proceed with an affordable housing development following the end of the pandemic.  The Fordham South property was appraised for $103 million (*See,* summary of 2024 appraisal conducted by BBG annexed hereto as Exhibit "I") and enjoys a far less complex debt and capital structure as compared to Fordham North.  The project is only subject to the original Columbia Pacific first mortgage in the principal sum of $44.5 million plus accrued interest.  This mortgage is now held by the Cremac F/S Lender following the 2025 assignment with Namdar's specific participation still to be fleshed out.

20.     The internal affairs of Fordham South are governed by an amended operating agreement for DS Fordham Landing 1 LLC (Fordham South's fee owner), in which the Dynamic Representative (Gary Segal) is designated as the sole managing member (*See*, Exhibit "J").  The Fordham South Debtors hold 100% of the Class A membership of the Fordham South fee owner through co-debtors Dynamic (99.5%) and DS 1 (.5%).  Namdar, through his affiliate (Namdar Fordham South) holds the 100% Class B non-voting membership interests entitled to a preferred return through a redemption formula.  The Class A membership interests were pledged to secure the personal guaranty of Gary Segal relating to the senior mortgage currently held by the F/S Lender which became subject to an Article 9 non-judicial auction sale in lieu of an actual foreclosure, necessitating the commencement of the lead Chapter 11 cases by Dynamic and DS 1.

**(D) Implications of the Clogging Doctrine**

21.     That the F/S Lender, which holds a senior mortgage, elected to forego a conventional foreclosure action in favor of a non-judicial Article 9 auction sale of the pledged interests, presents legal challenges in and of itself based upon the doctrine of clogging the Debtors' equity of redemption.

22.     The equitable maxim of "once a mortgage always a mortgage" has been uniformly recognized and applied for more than one hundred years. *Mooney v. Byrne*, 163 N.Y. 86, 94 (1900) ("'[O]nce a mortgage always a mortgage' is a maxim so sound and ancient as to be a rule of property."); *In re: Nolta's Estate*, 185 Misc. 501 (Sup. Ct. Onondaga Cty. 1945) (recognizing "the ages old maxim 'once a mortgage always a mortgage.'"). Through it, courts "jealously" guard against any device or formulation by which a lender may seek to deny or truncate a borrower's right to redeem its property from a mortgage.

23.     Courts will not countenance clever lenders utilizing loan structures which have the effect of undermining a full right of redemption. *Kirby v. Tricker*, 265 A.D. 149 (2nd Dept. 1942) ("So firmly has the rule of 'once a mortgage always a mortgage' become entrenched in the law that, even by express agreement made at the inception of the instrument, the debtor may not waive his right to redeem.").   As the Court of Appeals explained, "[a]lthough many attempts have been made, no form of covenant has yet been devised that will cut off the right of a mortgagor to redeem." *Mooney v. Byrne, supra*, 163 N.Y. at 94. *See also, Goldblatt v. Iris Construction Corp.*, 28 Misc.2d 621, 622 (Sup. Ct. Nassau Cty. 1960) ("Given a mortgage in intent, whatever form the instruments took, the courts have been very zealous to protect the debtor's equity of redemption from incursions of all descriptions, no matter how devious."); Martin A. Schwartz, *Legal Magic: Turning Real Property Foreclosures Into Uniform Commercial Code Sales,* F. Bar Journal

(May/June 2020) ("The concept of 'dual collateral' or an 'accommodation pledge' is just another artifice in a long line to try to avoid a state-mandated foreclosure process.").

24.     The redemption period provided by the UCC is materially different than that which is available to a borrower in a foreclosure context. That explains the intended purpose of a lender securing a loan by a pledge as well as a mortgage; the lender wants available to it a means to foreclose on the property far faster than a mortgage would otherwise permit. That, by definition, is a clogging of the equity of redemption. *See RA2 Troy LLC v. F1 135 Troy LLC*, 2023 WL 4044493 (Mich. Ct. App. 2023) ("Equity is jealous of all contracts between mortgagor and mortgagee, by which the equity of redemption is to be shortened or cut off."). *See also*, Emilie Cooper, *Do Dual Collateral Loans Impair NY Borrower Protections?*, Law360 (July 6, 2020), htts://www.law360.com/articles/1289236 ("[L]enders should carefully weigh the risks and rewards of employing a dual collateral structure, and be cognizant of the potentially harsh consequences of obstructing a borrower's equity of redemption."); Steven M. Herman & Nicholas Brandfon, *DRANO Revisited: Further Updates on the Doctrine of Clogging the Equity of Redemption*, Nat'l. Law Rev. (July 17, 2020) ("[L]enders should exercise caution in structuring loans with both a mortgage and equity pledge. Given the current judicial landscape, a dual collateral loan can expose a lender to years of litigation."). Thus, it cannot be automatically presumed that the Cremac Lenders enjoy a properly perfected security interest even if UCC filings were made or allegedly hold the original certificates.

**(a) Municipal Financing is on the Horizon**

25.     Operationally, the Debtors are primed to begin construction. In 2025, the Fordham South Debtors engaged a prominent affordable housing specialist, Lettire Construction Corp., and its development arm, Urban Builders Collaborative LLC (collectively, "Lettire"), to be the actual

developer and builder, responsible to construct the 983 affordable units at the site. The project will be funded by municipal financing provided by the New York City Housing Development Corporation (HDC), with construction financing to be provided by institutional lenders, including potentially Bank of America, which issued a formal letter of interest on January 22, 2026, a copy of which is attached hereto as <u>Exhibit</u> "K".

26.      The Debtor received the attached confirmation from HDC on December 31, 2025 that a complete application for municipal financing has been received, a copy of which confirmation is annexed hereto as <u>Exhibit</u> "L". As noted, part of the overall financing for Fordham South will be federal low-income housing tax credits to be made available in connection with the issuance of tax exempt bonds by HDC.

27.      The overall construction completion budget is extensive to say the least, aggregating almost $900 million for numerous line items, including funds dedicated through acquisition and reimbursement of prior expenses, to satisfy the existing senior debt held by F/S Lender and address the Class B preferred interests of Namdar. Under the intended framework, the Fordham South property itself would be contributed under a plan of reorganization to a new joint venture with Lettire. The joint venture company has already been organized and will act as the borrower and developer led by Lettire following satisfaction of all existing debt. The term sheet for the joint venture, together with an ensuing Joint Venture Operating Agreement and proposed sources and uses of cash under review are collectively annexed hereto as <u>Exhibit</u> "M".

28.      Both the City of New York and the State of New York are avid supporters of the Fordham South project. Local leaders issued a letter to Governor Hochul in March 2025 urging State support. The Assembly responded by allocating $55 million in capital funding under the State's 2025-2026 fiscal budget. Copies of the correspondence confirming the New York State

$55 million allocation are collectively annexed hereto as <u>Exhibit</u> "N".  The target for a closing on the municipal financing is mid-2026, such that the Fordham South entities all enjoy a clear path to reorganization under any metric of good faith.

**(2) Fordham North**

29.     The Fordham North project is not as advanced as Fordham South and has a far more complicated debt and capital structure, but it too enjoys great potential.  As noted, Fordham North is situated on three (3) contiguous parcels, separately owned, and requires a rezoning or upzoning to realize the full potential of the redevelopment.  Fordham North has been working steadily over the last several years to be in a position to obtain approvals for such rezoning to launch a truly transformative 14-acre mixed use development.  The key to success remains the anticipated approval for rezoning of the existing 750,000 square feet light manufacturing space into nearly 3.8 million square feet of residential, office and retail space along a half-mile continuous public waterfront promenade.  Fordham North anticipates completing and submitting a comprehensive Urban Land Use Review Process application (ULURP) within the upcoming months, which will unlock the door to perhaps the largest affordable housing development in the City's history.  Once the ULURP application is filed, the Debtors are confident that a new set of investors will be identified to deal finance the existing senior and mezzanine debt on this project currently held by the Cremac Lenders.  Letters from Penny Lee and former Bronx Borough President Ruben Diaz Jr relating to the current status of the Fordham North project are collectively annexed hereto as <u>Exhibit</u> "O".

## Legal Argument

## The Motions Should Be Denied

### (1) All of the Debtors Had the Requisite Authority to File the Chapter 11 Petitions

30.     Movants challenge the authority of Fordham Sponsor and Fordham Preferred to file Chapter 11 petitions relating to Fordham North.  Of note, none of the Movants challenge the authority of the Fordham South Debtors to file their respective cases, such that Fordham South faces no concerns over the authority of the Dynamic Representatives to act on its behalf.  The question of authority, however, does not lend itself to summary disposition.  It presents a mixed question of fact and law that must be decided with due recognition of good faith covenants and a legal interpretation as to how the companies operate pending a deadlock and whether alternative claims can be asserted.  Additionally, while Movants rely on Delaware law for their argument, the Sponsor OA is governed by New York law, which puts into question Movants' entire legal analysis.  *See,* Section 16.2(a) of <u>Exhibit</u> "B", which provides "[t]his Agreement and the rights of the Members hereunder shall be governed by, and interpreted in accordance with, the laws of the State of New York."

31.     As noted above, Namdor's presence on the Management Committee is subject to good faith covenants and he cannot act arbitrarily or unreasonably.  Yet, even if Namdar's deliberate efforts to stonewall the Chapter 11 filings are somehow condoned, the question of authority is not necessarily jurisdictional and, to the extent that the meeting was not sufficiently noticed, or lacked a quorum, these alleged defects can be remedied as necessary, depending on the circumstances of each case.  *In re East End Development LLC*, 491 B.R. 633, 638 (Bankr. E.D.N.Y. 2013).  As Judge Gropper explained in *In re Quad-C Funding LLC*, 496 BR 135, 141 (Bankr. S.D.N.Y. 2013):

The Court recognizes that the Bankruptcy Code does not establish express rules relating to authority to file a voluntary petition for relief. *See In re American Globus Corp*., 195 B.R. 263, 265 (Bankr. S.D.N.Y. 1996). In order to determine authority to file, bankruptcy courts initially look to the state law governing the entity. *Price v. Gurney*, 324 U.S. 100, 106, 65 S.Ct. 513, 89 L.Ed. 776 (1945). In this case, Delaware law is the applicable law. However, the burden and type of proof necessary to make a showing of authority to file a petition are matters of federal bankruptcy law, as a court's authority to dismiss a case—if any—flows from Bankruptcy Code § 1112(b) and, further, the rights of creditors and the success of a reorganization may be at stake. *See In re Lady Madonna Indus., Inc.*, 76 B.R. 281, 287 (S.D.N.Y. 1987) ("Factors relevant to the determination of whether federal law should be applied include: the need for a uniform federal rule, the extent to which the transaction in question fits within the normal course of activities governed by state law, and the possibility of the state rule frustrating the operation of the federal statutory scheme.") (citations omitted); *In re W.R. Grace & Co.*, 475 B.R. 34, 156 (D.Del. 2012) ("Courts have routinely recognized various sections of the Bankruptcy Code as countervailing federal interests that can lawfully alter state law contract rights.").

32.    The burden rests on the Movants to establish a lack of authority as a basis for dismissal by a preponderance of the evidence. *In re Georgian Backyard LLC*, 661 B.R. 102, 105 (Bankr. E.D.N.Y. 2024). *See also, In re Quad-C Funding LLC, supra*, 496 BR at 142 ("Because the Court does not take the issue of dismissal lightly, the Court will place the burden of proof entirely on the Movants to demonstrate by a preponderance of the evidence that the Debtors' bankruptcy cases were unauthorized"). The Movants' papers alone do not sustain this burden, and an evidentiary hearing is necessary to determine all of the relevant factors cited above. Moreover, the cases relied upon by Movants do not short circuit the need for further hearings.

33.    In this regard, *In re 301 W. North Avenue, LLC*, 668 B.R. 583, 597 (Bankr. N.D. Ill 2025), relied upon by Namdar, actually supports the Debtors, as the Court notes that "an unauthorized bankruptcy petition may be subsequently ratified", *citing In re Kelly*, 649 B.R. 448, 474 (Bankr. W.D.Pa. 2023). Although the Court in *301 W. North Avenue* found that no subsequent ratification had occurred, the facts are substantially different here, as the Sponsor OA provides

alternative procedures for proceeding in the face of a deadlock and the Dynamic Representatives retain the ability to expel Namdar from the Management Committee entirely.

34.     Additionally, the unreported decision by Judge Glenn in *In re Pasta Bar by Scotto II, LLC*, 2015 WL 7307246 (Bankr. S.D.N.Y. November 19, 2015) is also distinguishable on the very key point that although super majority provisions are enforceable, the members there were not subject to the same express good faith obligations, or potential buy-out rights to break a deadlock.  Hence, the facts are vastly different here and *Pasta Bar* is not controlling.

35.     Likewise, the Cremac affiliates' preferred equity holder in Fordham Preferred as successor to CPIF MCA LLC also does not have a blocking position under the operative Operating Agreement between the common members and the preferred investor.  To the contrary, under Section 13.1 of the Operating Agreement, the preferred investor is "deemed to have loaned cash to the company", making the preferred investor a creditor.  As a creditor, the preferred investor cannot utilize blocking provisions as a disguised means to enforce a claim based on sound policy.

36.     The long-standing prohibition against blocking rights was reviewed in the context of a blocking provision by the Hon. Kevin Carey in *In re Intervention Energy Holdings, LLC*, 553 B.R. 258 (Bankr. D. Del. 2016), where the Court refused to enforce a requirement in the debtor's operating agreement similar to the one at issue here on the ground that it was void as contrary to public policy.  As Judge Carey noted:

> It has been said many times and many ways. Prepetition agreements purporting to interfere with a debtor's rights under the Bankruptcy Code are not enforceable.  If any terms in the Consent Agreement exist that restrict the right of the debtor parties to file bankruptcy, such terms are not enforceable.  Any attempt by a creditor in a private pre-bankruptcy agreement to opt out of the collective consequences of a debtor's future bankruptcy filing is generally unenforceable. The Bankruptcy Code pre-empts the private right to contract around its essential provisions.  It would defeat the purpose of the Code to allow parties to provide by contract that the provisions of the Code should not apply.  It is a well settled principal that an advance agreement to waive the benefits conferred by the bankruptcy laws is

wholly void as against public policy. (Internal quotation marks and citations omitted).

*Id.*, at 263. *See also, In re Insight Terminal Sols., LLC*, 2019 WL 4640773, at *1 (Bankr. W.D.Ky. Sept. 23, 2019) [denying motion to dismiss on basis that waiver of right to file without warrant holder's consent is void as against public policy]; *In re Lexington Hosp. Grp., LLC*, 577 B.R. 676, 683 (Bankr. E.D. Ky. 2017) [waiver of right to file imposed by lender void as against public policy].

37.     Further, the substance of the waiver is what makes it void, not whether the form has been cleverly disguised by counsel drafting the documents. *In re Bay Club Partners-472, LLC*, 2014 WL 1796688, at *5 (Bankr. D. Or. May 6, 2014) ["That the members of Bay Club signed the Operating Agreement among themselves rather than acquiescing in the bankruptcy waiver provision in a Loan agreement with Legg Mason is a distinction without a meaningful difference. The bankruptcy waiver in Section 11.1.24 of the Operating Agreement is no less the maneuver of an "astute creditor" to preclude Bay Club from availing itself of the protections of the Bankruptcy Code prepetition, and it is unenforceable as such, as a matter of public policy."].

38.     In view of the foregoing, F/N Lender's attempt to impede the Chapter 11 case should not be given effect since it constitutes an impermissible waiver of the right to seek bankruptcy protection.

### (2) The Movants Cannot Meet Their Burden of Establishing Bad Faith

39.     The Debtors, even preliminarily, have established more than a credible basis that both redevelopment projects have a reasonable chance of success, with Fordham South truly on the cusp of great things.  Thus, mechanical application of the C-TC factors would do these projects a grave injustice and, on its face, this is far from a two-party dispute.  If anything, it is a "2 against 1" dispute and the good faith of the Debtors can be amply established.

17

40.     It is well-recognized that "the burden is on the movant to prove bad faith, and dismissal for bad faith is to be used sparingly to avoid denying bankruptcy relief to statutorily eligible debtors except in extraordinary circumstances." *In re Century/ML Cable Venture*, 294 B.R. 9, 34 (Bankr. S.D.N.Y. 2003).  *See also*, *In re Consolidated Distributors, Inc.*, 2013 WL 3929851 *7, fn. 47 (Bankr. E.D.N.Y. 2013) ["Many courts have held that dismissal on bad faith grounds should be granted sparingly"]; *In re Sletteland, supra*, 260 B.R. at 662 [noting that courts dismiss cases on bad faith grounds sparingly]; *In re 234-6 W. 22nd St. Corp.*, 214 B.R. 751, 757 (Bankr. S.D.N.Y. 1997) [same]; *In re Johns-Manville Corp.*, 36 B.R. 727, 737 (Bankr. S.D.N.Y. 1984) [dismissal on bad faith grounds should be granted sparingly, and only upon a clear showing of abuse of bankruptcy process, avoiding an "intense focus on the debtor's motives in filing"]

41.     There is nothing in the Bankruptcy Code that makes a company facing foreclosure somehow ineligible for Chapter 11 relief even if it frustrates the foreclosing creditor.  In the familiar words of the late Judge Richard Posner of the Seventh Circuit, "[i]t is not bad faith to seek to gain an advantage from declaring bankruptcy—why else would one declare it?"  *Matter of James Wilson Assocs.*, 965 F.2d 160, 170 (7th Cir. 1992).

42.     In the Second Circuit, the framework for a good faith/bad faith analysis emanates out of *In re Cohoes Industrial Terminal Inc.*, 931 F.2d 222 (2d Cir. 1991) ("*Cohoes*") and *In re C-TC 9th Avenue Partnership*, 113 F.3d 1304 (2d Cir. 1997) ("*C-TC*").  In *Cohoes, supra*, an attack was made under Rule 11 after a bankruptcy petition was filed to challenge the constitutionality of a state court default judgment terminating a lease.  One of the questions posed was "whether it is frivolous for a corporation in financial distress, but not *in extremis,* to make a Chapter 11 filing if one of the purposes for the filing is to attack collaterally a state court default judgment".  *Cohoes, supra,* 931 F.2d at 224.

18

43.     The Circuit Court answered this question squarely in the negative and reversed an

award of sanctions.  In reaching this conclusion, the Circuit Court of Appeals made a number of

important observations which should help guide the Court here:

> A petition for Chapter 11 bankruptcy may be deemed frivolous if it is clear that on
> the filing date there was no reasonable likelihood that the debtor intended to
> reorganize and no reasonable probability that it would eventually emerge from
> bankruptcy proceedings. *See, e.g., Carolin Corp. v. Miller,* 886 F.2d 693, 698–702
> (4th Cir. 1989); *In re Coffee Cupboard, Inc.,* 119 B.R. 14, 17–18 (E.D.N.Y. 1990);
> *In re Marion Street Partnership,* 108 B.R. 218, 223 (Bankr. D.Minn. 1989).
> **Generally, courts should conclude that a debtor has no demonstrable intent to
> reorganize only if, upon considering the totality of the circumstances, there is
> substantial evidence to indicate that the debtor made a bad faith filing**. *See* 5
> C. King, *Collier on Bankruptcy* § 1112.03, at 112–33 (15th ed. 1989).

*Id.*, at 227 (emphasis supplied).  The Court went on to state that:

> Filing a bankruptcy petition with the intent to frustrate creditors does not by itself
> "establish an absence of intent to seek rehabilitation." *Banque de Financement, S.A.
> v. First National Bank,* 568 F.2d 911, 917 (2d Cir. 1977). Indeed, because a major
> purpose behind our bankruptcy laws is to afford a debtor some breathing room from
> creditors, it is almost inevitable that creditors will, in some sense, be "frustrated"
> when their debtor files a bankruptcy petition. *See, e.g., In re Food Workshop, Inc.,*
> 70 B.R. 962, 967 n. 3 (Bankr. S.D.N.Y. 1987). In reality, there is "a  considerable
> gap between delaying creditors, even secured creditors, on the eve of foreclosure
> and the concept of abuse of judicial purpose." *Collier* § 1112.03, at 1112–33.

*Id.*, at 228.

44.     In the Second Circuit's subsequent opinion on good faith, in *C-TC, supra*, the

debtor there, being a partnership in dissolution, was deemed ineligible for bankruptcy relief as a

matter of law.  This alone mandated dismissal of the bankruptcy case.  In fact, the matter was

largely decided in the lower courts on the basis of the debtor's ineligibility without any discussion

by the District Court of bad faith.  The Circuit Court of Appeals affirmed the Debtor's ineligibility,

and then took the opportunity to address the concept of bad faith.  Noting that bad faith is not *per*

*se* an enumerated ground for dismissal under Section 1112(b), the Second Circuit then identified

factors to be consider which have become popularly known in New York as the *C-TC* Factors. These factors are identified as follows:

    (1)   the debtor has only one asset;

    (2)   the debtor has few unsecured creditors whose claims are small in relation to those of the secured creditors;

    (3)   the debtor's one asset is the subject of a foreclosure action as a result of arrearages or default on the debt;

    (4)   the debtor's financial condition is, in essence, a two party dispute between the debtor and secured creditors which can be resolved in the pending state foreclosure action;

    (5)   the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights;

    (6)   the debtor has little or no cash flow;

    (7)   the debtor can't meet current expenses including the payment of personal property and real estate taxes; and

    (8)   the debtor has no employees.

*C-TC, supra,* 113 F.3d at 1311.

45.    Importantly, Movants rely upon a myopic checkoff of the *C-TC* Factors without regard to the totality of the circumstances or any mention of the projects at all.  Thus, the Courts have recognized that while the *C-TC* Factors certainly help define bad faith, the lynchpin of the analysis still revolves around the dual inquiry of whether, on the filing date, there was no reasonable likelihood that the debtor intended to reorganize and no reasonable prospect that the debtor was able to reorganize.

46.    Indeed, the Hon. Nancy Hershey Lord has previously cautioned that the Court:

will not engage in a mechanical counting exercise to determine whether the Debtor filed this bankruptcy case in bad faith.  These factors are to be considered in the context of the totality of the circumstances and not in a vacuum.  No one factor is determinative of good faith . . . ."  (internal quotation marks and citations omitted)

*In re Consolidated. Distributors, Inc., supra,* 2013 WL 3929851 at \*7.  *See, also, In re Hartford & York LLC*, 2014 WL 985449, \*4 (Bankr. E.D.N.Y. March 13, 2014); *In re R & G Properties, Inc.*, 2009 WL 1076703, at \*2 (Bankr. D. Vt. Apr. 16, 2009) ("Simply checking off these factors on the list does not prove bad faith.").

47.      Rather, Movants must establish both prongs of objective futility and subjective bad faith before the cases can be dismissed for bad faith.  *See*, *In re 68 West 127th Street LLC,* 285 BR. 838, 846 (Bankr. S.D.N.Y. 2002) (analyzing *C-TC* and holding that "[t]he critical test of a debtor's bad faith remains whether on the filing date there was no reasonable likelihood that the debtor intended to reorganize and whether there is no reasonable possibility that the debtor will emerge from bankruptcy."); *In re Kingston Square Assocs.*, 214 B.R. 713, 725 (Bankr. S.D.N.Y. 1997) ("[T]he standard in this Circuit is that a bankruptcy petition will be dismissed if both objective futility and subjective bad faith in filing the petition are found."); *In re RCM Global Long Term Corp. Appreciation Fund Ltd.*, 200 B.R. 514, 520 (Bankr. S.D.N.Y. 1996) ("In this Circuit, a petition will be dismissed if both objective futility of the reorganization process and subjective bad faith in filing the petition are found . . . But a court should reach the conclusion that there is no demonstrable ability to reorganize only upon the strongest evidentiary showing.").

48.      Here, the evidence, once fully adduced, will <u>not</u> support a finding of either objective or subjective futility.  To the contrary, the support for the development projects received from both New York City and New York State, before the Chapter 11 filings and continuing in the past weeks, amply demonstrates both the intent of the Debtors to press forward and the ability to successfully obtain the necessary financing to complete construction.

49.      It is not bad faith for the Debtor to seek Chapter 11 relief to invoke certain statutory rights available under the Bankruptcy Code, including the protections of the automatic stay. Court

have consistently recognized as a "truism"—even a court that eventually dismissed a petition—

that "it is not bad faith to seek to avail oneself of a particular protection in the Bankruptcy Code—

Congress enacted such protections with the expectation that they would be used." *In re Integrated*

*Telecom Express, Inc.*, 384 F.3d 108, 127 (3d Cir. 2004).    As former judge Robert D. Drain

explained in *In re 68 W. 127 St., LLC,*, 285 B.R. 838, 844 (Bankr. S.D.N.Y. 2002):

> Keeping the primary focus on the permissible uses of the Bankruptcy Code is
> important because, taken out of context, the exercise of certain rights under the
> Code that are perfectly legitimate may appear hurtful, even malicious, yet the
> exercise of a statutory right or remedy should rarely, if ever, be said to be in bad
> faith.

50.    A similar sentiment was expressed by the Court in *In re Clinton Centrifuge, Inc.*,

72 B.R. 900, 905 (Bankr. E.D.Pa. 1987), which explained that:

> Thus, in evaluating a debtor's good faith, the court's only inquiry is to determine
> whether the debtor seeks to abuse the bankruptcy law by employing it for a purpose
> for which it was not intended.  When a debtor is motivated by plausible legitimate
> reorganization (or liquidation) purposes and not solely or predominantly by the
> mere desire to prevent foreclosure or hinder creditors, bad faith is not present in a
> chapter 11 case.

51.    In this regard, the Ninth Circuit Court of Appeals decision in *In re Sylmar Plaza,*

*L.P.*, 314 F.3d 1070 (9th Cir. 2002) is instructive.  There, the lender challenged the debtor's good

faith in connection with confirmation of the plan, arguing that the plan "was crafted solely to

permit the debtors to take advantage of the Bankruptcy Code to profit personally at the expense of

a creditor".  *Id., at 1074.*  In rejecting this argument, the Ninth Circuit stated:

> that a creditor's contractual rights are adversely affected does not by itself warrant
> a bad faith finding.   In enacting the Bankruptcy Code, Congress made a
> determination that an eligible debtor should have the opportunity to avail itself of a
> number of Code provisions which adversely alter creditors' contractual and
> nonbankruptcy rights.  The fact that a debtor proposes a plan in which it avails itself
> of an applicable Code provision does not constitute evidence of bad faith".

*Id.*, at 1075 (internal citations and quotation marks omitted).

52.     So, too, here, the Debtor seeks to use the Chapter 11 case for a purpose that is well within the normal purview of the Bankruptcy Code, and not for any improper litigation tactic as the Movants allege.  *See, In re Walden Ridge Development LLC*, 292 B.R. 58, 64 (Bankr. N.J. 2003) ("In summary, the test to be applied by this Court relative to a motion to dismiss is an examination of the totality of the circumstances, not rigid application of specific factors . . . It is undisputed that the Debtor's motive in filing Chapter 11 was to preserve its Purchase Contract. The preservation of value is a permissible motive for filing Chapter 11 and the good faith requirement must be viewed in context with Congress' intent to promote reorganization").

53.     Accordingly, there is no basis for a finding that any of the Debtor acted in bad faith either subjectively or objectively, and the Motions should be denied.

## Conclusion

54.     For all of the reasons stated above, the Motions should be denied, or at the least, an evidentiary hearing should be scheduled following discovery as outlined herein.

Dated:  New York, NY
          January 26, 2026

                                    GOLDBERG WEPRIN FINKEL
                                    GOLDSTEIN LLP
                                    Attorneys for the Debtors
                                    125 Park Avenue, 12th Floor
                                    New York, New York 10017
                                    (212) 221-5700

                                    By:     /s/ Kevin J. Nash