**LIMITED LIABILITY COMPANY AGREEMENT**

**OF**

**FORDHAM LANDING PREFERRED SPONSOR LLC**

**A DELAWARE LIMITED LIABILITY COMPANY**

**DATED AS OF JULY __, 2022**

**Table of Contents**

Page

SECTION 1.          DEFINITIONS ...................................................................2

SECTION 2.          ORGANIZATION OF THE COMPANY ......................................2

    2.1.          Name ...............................................................................2
    2.1.          Registered Agent and Registered Office................................2
    2.2.          Principal Office .................................................................2
    2.3.          Filings .............................................................................2
    2.4.          Term ...............................................................................2
    2.5.          Admission of Members......................................................2
    2.6.          No Partnership .................................................................2

SECTION 3.          PURPOSE .........................................................................2

SECTION 4.          EXPENSES ........................................................................3

SECTION 5.          CAPITAL CONTRIBUTIONS AND CAPITAL ACCOUNTS ..................3

    5.1.          Initial Capital Contributions ..............................................3
    5.2.          Additional Capital Contributions .......................................3
    5.3.          Percentage Ownership Interest ..........................................5
    5.4.          Return of Capital Contribution ..........................................5
    5.5.          No Interest on Capital ......................................................5
    5.6.          Capital Accounts ..............................................................6
    5.7.          New Members ..................................................................6

SECTION 6.          DISTRIBUTIONS .................................................................7

    6.1.          Distribution of Distributable Funds .....................................7
    6.2.          Distribution Priority for Indemnities ...................................8
    6.3.          Distributions in Kind.........................................................8

SECTION 7.          ALLOCATIONS ...................................................................9

    7.1.          Allocation of Net Income and Net Losses Other than in Liquidation ........9
    7.2.          Other Allocation Provisions................................................9
    7.3.          Allocations for Income Tax Purposes ................................11

SECTION 8.          BOOKS, RECORDS, TAX MATTERS AND BANK ACCOUNTS..........................11

    8.1.          Books and Records .........................................................12
    8.2.          Reports and Financial Statements.....................................12
    8.3.          Partnership Representative................................................10
    8.4.          Bank Accounts ...............................................................13
    8.5.          Tax Returns ...................................................................13

SECTION 9.          MANAGEMENT AND OPERATIONS ......................................14

| | | | |
|---|---|---|---|
| 9.1. | | Management | 14 |
| 9.2. | | Management Committee | 14 |
| 9.3. | | Annual Business Plan | 17 |
| 9.4. | | Affiliate Transactions; Fees | 18 |
| 9.5. | | Other Activities | 19 |
| 9.6. | | Limitation on Actions of Members; Binding Authority | 19 |
| 9.7. | | Intentionally Omitted | 18 |
| 9.8. | | FCPA/OFAC | 20 |

SECTION 10.    CONFIDENTIALITY ............21

SECTION 11.    REPRESENTATIONS AND WARRANTIES ............22

| 11.1. | | In General | 22 |
|---|---|---|---|
| 11.2. | | Representations and Warranties | 22 |

SECTION 12.    SALE, ASSIGNMENT, TRANSFER OR OTHER DISPOSITION ............25

| 12.1. | | Prohibited Transfers | 25 |
|---|---|---|---|
| 12.2. | | Permitted Transfers | 25 |
| 12.3. | | Admission of Transferee | 26 |
| 12.4. | | Withdrawals and Withdrawing Members | 27 |
| 12.5. | | Subsidiary Transfer Restrictions | 28 |

SECTION 13.    DISSOLUTION ............28

| 13.1. | | Limitations | 28 |
|---|---|---|---|
| 13.2. | | Exclusive Events Requiring Dissolution | 28 |
| 13.3. | | Liquidation | 28 |
| 13.4. | | Continuation of the Company | 29 |

SECTION 14.    INDEMNIFICATION ............29

| 14.1. | | Exculpation of Members | 29 |
|---|---|---|---|
| 14.2. | | Indemnification by Company | 29 |
| 14.3. | | General Indemnification by the Members | 30 |

SECTION 15.    LIMITED POWER OF ATTORNEY ............31

| 15.1. | | Grant | 31 |
|---|---|---|---|
| 15.2. | | Conclusive Evidence | 31 |

SECTION 16.    MISCELLANEOUS ............31

| 16.1. | | Notices | 32 |
|---|---|---|---|
| 16.2. | | Governing Law | 33 |
| 16.3. | | Successors | 33 |
| 16.4. | | Pronouns | 33 |
| 16.5. | | Table of Contents and Captions Not Part of Agreement | 33 |
| 16.6. | | Severability | 33 |
| 16.7. | | Counterparts | 34 |
| 16.8. | | Entire Agreement and Amendment | 34 |
| 16.9. | | Further Assurances | 34 |

16.10.       No Third Party Rights ........................................................................34
16.11.       Incorporation by Reference........................................................................34
16.12.       Limitation on Liability ........................................................................34
16.13.       Remedies Cumulative; Dispute Costs........................................................................34
16.14.       No Waiver ........................................................................35
16.15.       Limitation On Use of Names ........................................................................35
16.16.       Certificates or Affidavits........................................................................35
16.17.       Publicly Traded Partnership Provision ........................................................................35
16.18.       Status as Accredited Investors ........................................................................35
16.19.       Uniform Commercial Code........................................................................35
16.20.       Public Announcements ........................................................................36
16.21.       No Construction Against Drafter ........................................................................36

**EXHIBIT A** Capital Contributions
**EXHIBIT B** Definitions
**EXHIBIT C** Major Decisions
**EXHIBIT D** Buy/Sell
**EXHIBIT E** Initial Budget and Plan

# LIMITED LIABILITY COMPANY AGREEMENT

## OF

## FORDHAM LANDING PREFERRED SPONSOR LLC

THIS LIMITED LIABILITY COMPANY AGREEMENT of FORDHAM LANDING PREFERRED SPONSOR LLC (this "**Agreement**") is made and entered into and is effective as of July ___, 2022, by and among DS 3 GP Inc. a New York corporation ("**DS 3**"), Dynamic Star III LLC, a Delaware limited liability company ("**Dynamic**"), The Plymouth Group III LLC, a New York limited liability company ("**Plymouth**"), and Namdar Fordham Landing LLC, a New York limited liability company ("**Namdar**," Dynamic, DS 3, Plymouth and Namdar, each, a "**Member**" and, together, the "**Members**").

W I T N E S S E T H :

WHEREAS, the Company was formed on July 8, 2022, pursuant to the Act; and

WHEREAS, the Company is, together with [CPIF MRA LLC, a Delaware limited liability company] ("**Preferred Investor**"), all of the Members of Fordham Landing Preferred LLC, a Delaware limited liability company, (the "**PrefCo**");

WHEREAS, PrefCo is the sole member of DS Fordham Landing 2 LLC, DS Fordham Landing 4 LLC and MDBZJGGS LLC (collectively, the "**Borrowers**");

WHEREAS, DS Fordham Landing 2 LLC owns the real property at 2371 Exterior Street, Bronx, New York, DS Fordham Landing 4 LLC owns the real property located at 2391 & 2401 Exterior Street, Bronx, New York and MDBZJGGS LLC owns the real property located at 301 West Fordham Road, Bronx, New York (collectively, the "**Properties**");

WHEREAS, pursuant to Assignment and Assumption Agreements entered into by and among the members of the Borrowers and Prefco, Prefco owns One Hundred Percent (100%) of the membership interests in each of the Borrowers;

WHEREAS, the Members desire to enter into this Agreement in order to, *inter alia*: (i) set forth the rights, obligations and duties of Members and the Company; and (ii) adopt this Agreement as the limited liability company agreement of the Company, as contemplated by the Act.

NOW, THEREFORE, in consideration of the agreements and covenants set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

Section 1.  Definitions.  Capitalized terms used herein shall have the meanings ascribed to such terms in this Agreement (including, without limitation, Exhibit B and the other Exhibits attached hereto).

Section 2.  Organization of the Company.

2.1.  Name.  The name of the Company shall be "FORDHAM LANDING PREFERRED LLC".  The business and affairs of the Company shall be conducted under such name or such other name as the Manager deems necessary or appropriate to comply with the requirements of law in any jurisdiction in which the Company may elect to do business.

2.1.  Registered Agent and Registered Office.  The Company shall maintain a registered office in the state of New York and a registered agent for service of process in the State of New York as required by the Act.  The Manager shall give notice to the Members prior to any change in the location of the principal office of the Company.

2.2.  Principal Office.  The Company's principal office shall be located at c/o 10 West Street, Apartment 40B, New York, NY, 10004, or such other place as the Manager may determine.  The Manager shall give notice to the Members prior to any change in the location of the principal office of the Company.

2.3.  Filings.  Before the execution of this Agreement the Company has duly filed or caused to be filed the Certificate of Formation of the Company with the office of the Secretary of State of the State of Delaware, as provided in the Act, and the Members hereby ratify such filing.  The Members shall use their respective commercially reasonable efforts to take such actions as may be reasonably necessary to perfect and maintain the status of the Company as a limited liability company under the laws of the State of Delaware.  Notwithstanding anything contained herein to the contrary, the Company shall not do business in any jurisdiction that would jeopardize the limitation on liability afforded to the Members under the Act or this Agreement.

2.4.  Term.  The Company shall continue in existence from the date hereof in perpetuity until the Company is dissolved and liquidated as provided in Section 13.

2.5.  Admission of Members.  Upon execution of this Agreement, each of the Members shall be admitted to the Company as members.

2.6.  No Partnership.  The Members intend that the Company shall not be a partnership (including, without limitation, a limited partnership) or joint venture, and that no Member be an agent, partner or joint venture of any other Member for any purposes other than U.S. Federal and state tax purposes, and this Agreement shall not be construed to suggest otherwise.

Section 3.  Purpose.

Capitalized terms used in this Section 3 and not otherwise defined shall have the meanings ascribed to such terms in the Prefco LLCA. Subject to the provisions of Section 17, the sole purpose of the Company is to, indirectly through its ownership interest in Prefco, acquire, own, develop, improve, lease, operate, manage, maintain, finance, refinance, sell, exchange or otherwise deal with and

dispose of the Properties, and undertake such other activities related or incidental thereto as the Manager may determine is in the interests of the Company.

Section 4.    Expenses.

4.1    Except as otherwise specifically provided in this Agreement or determined by the Management Committee, each Member shall bear its own general costs and expenses (including, without limitation, any office and administrative and similar general overhead expenses).  The Company will bear and be charged with all ordinary, necessary and recurring administrative costs and expenses of the Company and the Manager, including, without limitation: (i) reasonable fees and expenses of consultants, appraisers, custodians, counsel, independent public accountants, actuaries and other agents; (ii) costs and expenses incurred for the preparation and distribution of financial reports, tax reports and other information for the benefit of the Members; (iii) any taxes, fees or other governmental charges levied against the Company or any Subsidiary or their respective income or assets or in connection with their respective business or operations; (iv) costs of any agency or administrative actions or hearings, any governmental action or third-party litigation or other matters that are the subject of indemnification pursuant this Agreement; (v) any insurance expenses; (vi) costs of winding-up and liquidating the Company or any Subsidiary; (vii) reasonable and necessary travel expenses; and (viii) all other costs and reasonable expenses of the Company, the Manager, the Manager's agents and authorized persons in connection with this Agreement.

4.2    All expenses reasonably incurred by Namdar and Dynamic and their Affiliates in organizing the Company, any Subsidiary and the Manager (the "**Organizational Expenses**"), including, without limitation, legal fees, accounting fees, filing fees, printing expenses, postage, delivery charges and travel expenses, shall be charged to the Company, and the Company shall reimburse Namdar and Dynamic and their Affiliates for Organizational Expenses reasonably incurred by on behalf of the Company or any Subsidiary.

4.3    Investment Maintenance Costs shall be at the sole expense of the Company and shall be reimbursed promptly by the Company to the Manager (or its Affiliates), provided such Investment Maintenance Costs are without duplication of any other amounts paid or reimbursable by the Company (or any Subsidiary) to Manager (or its Affiliates).

4.4    The Company shall cause any amounts reimbursable by any Subsidiary to conform to the reimbursements set forth in this Section 4 (without duplication).

Section 5.    Capital Contributions and Capital Accounts.

5.1.    Initial Capital Contributions.  As of the date hereof, each Member has contributed capital as set forth opposite its name in Exhibit A attached hereto under the heading Initial Capital Contribution (such capital contribution, the "**Initial Capital Contribution**").

5.2.    Additional Capital Contributions.

(a)    In addition to the Capital Contributions made pursuant to Section 5.1 above, additional capital may be called for from the Members by the Manager by written notice to the Members from time to time as and to the extent capital is necessary to effect an investment or

expenditures approved by the Management Committee, and/or as otherwise may be required for the development of the Project in accordance with the approved Annual Business Plan. For the purposes of clarification and without limiting the foregoing, no additional Capital Contributions may be called without the express consent of the Namdar Member. For the purposes of clarification and without limiting the forgoing, any capital expenditures set forth in the Annual Business Plan, shall be deemed expressly consented to by Namdar.

(b)  Subject to clause (c) below and Section 9.9, except as otherwise agreed in writing by the Members, such additional Capital Contributions shall be in an amount for each Member equal to the product of the amount of the aggregate Capital Contribution called for multiplied by such Member's Percentage Interest. Such additional Capital Contributions shall be payable by the Members to the Company upon the later of: (i) twenty (20) days after written request by the Management Committee, or (ii) the date when the Capital Contributions are required, as set forth in a written request by the Management Committee.

(c)  If a Member (a "**Non-Funding Member**") fails to make a Capital Contribution that is required as provided in Sections 5.1, 5.2(a) or 9.9 within the time frame required therein (the amount of the failed Capital Contribution shall be the "**Default Amount**"), the other Member(s), provided that it has made the Capital Contribution required to be made by it, shall have the following remedies (such Member exercising such remedy is hereinafter referred to as a "**Contributing Member**"):

1.  to advance to the Company on behalf of, and as a loan to the Non-Funding Member, an amount equal to the Default Amount to be evidenced by a promissory note in form reasonably satisfactory to the Contributing Member (each such loan, a "**Default Loan**"). The Default Loan shall constitute a debt owed by the Non-Funding Member to the Contributing Member. Any Default Loan shall bear interest at the Default Loan Rate, and shall be payable by the Non-Funding Member on demand from the Contributing Member and, without limiting the foregoing, from any Distributions due to the Non-Funding Member hereunder. Interest on a Default Loan to the extent unpaid, shall accrue and compound on an annual basis. A Default Loan shall be pre-payable, in whole or in part, at any time or from time to time without penalty. Any such Default Loan shall be with full recourse to the Non-Funding Member and, without limiting the foregoing, shall be secured by the Non-Funding Member's right to receive Distributions. Any advance to the Company by the Contributing Member on behalf of a Non-Funding Member pursuant to this paragraph shall be deemed to be a Capital Contribution made by the Non-Funding Member except as otherwise expressly provided herein. The Capital Account of the Non-Funding Member shall be credited with the amount of such Default Loan. All Distributions to the Non-Funding Member hereunder shall be applied first to payment of any interest due under any Default Loan and then to principal until all amounts due thereunder are paid in full. While any Default Loan is outstanding, the Company shall be obligated to pay directly to the Contributing Member, for application to and until all Default Loans have been paid in full, the amount of (x) any Distributions payable to the Non-Funding Member, and (y) any proceeds of the sale of the Non-Funding Member's Interest in the Company; and

2.  if not fully repaid within sixty (60) days after being made, any Default Loan (including any accrued but unpaid interest thereon) shall be converted into a Capital Contribution made by the Contributing Member (each a "**Capital Conversion**") whereupon (i)

the Percentage Interests of the Members shall be recalculated to increase the Contributing Member's Percentage Interest by the percentage (the "**Default Adjustment Percentage**") determined by dividing one hundred percent (100%) of the amount of the Converted Amount by the sum of the Members' Total Investment (which shall include such Converted Amount), (ii) the Contributing Member's Capital Account shall be increased by (x) one hundred percent (100%) of the amount of the applicable Capital Contribution required to be made (and made) by such Contributing Member pursuant to Section 5.2(a) and (y) one hundred percent (100%) of the additional Capital Contribution, (iii) the Percentage Interest of the Non-Funding Member shall be decreased by the Default Adjustment Percentage, and (iv) the Capital Account of the Non-Funding Member shall be decreased by one hundred percent (100%) of the amount of the Capital Contributions deemed made by the Non-Funding Member under Section 5.2(b)(1) in connection with such Default Loan.

3.    For purposes of this Agreement, "**Converted Amount**" shall mean, with respect to any Capital Conversion, the amount of the Default Loan (and any accrued but unpaid interest thereon) converted into an additional Capital Contribution pursuant to a Capital Conversion.

4.    Notwithstanding anything set forth in this Section 5.2 to the contrary, Plymouth shall not be obligated to make any additional capital contributions to the Company until the earlier of (i) payment in full of the Plymouth Required Payment (as hereinafter defined), whether by distributions of Net Cash Flow from the Company in accordance with Section 6.1 and/or by Supplemental Payments (as hereinafter defined), and (ii) the Outside Redemption Date (as hereinafter defined). In the event of any capital call which the Plymouth Member is not obligated to contribute to in accordance with the forgoing, all Capital Contributions that would be attributable to the Plymouth Member shall instead be the obligation of the Dynamic Member for all purposes hereunder, including without limitation, the remedies available to the Company for Non-Funding Members.

5.3.    Percentage Ownership Interest.    Each Member shall have a percentage ownership interest (as the same may be adjusted as provided in this Agreement, a "**Percentage Interest**") in the Company at any time equal to the quotient (expressed as a percentage) of the Total Investment made (or deemed made) by such Member divided by the Total Investment made (or deemed made) by all of the Members.    Percentage Interests shall not be adjusted by distributions made (or deemed made) to a Member.    The Percentage Interests of the Members in the Company shall be adjusted from time to time, as necessary, so that the respective Percentage Interests of the Members at any time shall be in proportion to their respective cumulative Total Investment made (or deemed to be made) pursuant to Sections 5.1 and 5.2, as the same may be further adjusted pursuant to Sections 5.2(c)(3).

5.4.    Return of Capital Contribution.    Except as approved by the Management Committee in writing, no Member shall have any right to withdraw or make a demand for withdrawal of the balance reflected in such Member's Capital Account (as determined under Section 5.6) until the full and complete winding up and liquidation of the business of the Company.

5.5.    No Interest on Capital.    Interest earned on Company funds shall inure solely to the benefit of the Company, and, except as expressly provided herein, no interest shall be paid

upon any Capital Contributions nor upon any undistributed or reinvested income or profits of the Company.

5.6.   Capital Accounts. (a) A separate capital account (the "**Capital Account**") shall be maintained for each Member in accordance with Section 1.704-1(b)(2)(iv) of the Regulations. Without limiting the foregoing, the Capital Account of each Member shall be increased by (i) the amount of any Capital Contributions made (actually, rather than deemed) by such Member, (ii) the amount of Income allocated to such Member and (iii) the amount of income or profits, if any, allocated to such Member not otherwise taken into account in this Section. The Capital Account of each Member shall be reduced by (i) the amount of any cash and the fair market value of any property distributed to the Member by the Company (net of liabilities secured by such distributed property that the Member is considered to assume or take subject to), (ii) the amount of Loss allocated to the Member, (iii) the amount of expenses or losses, if any, allocated to such Member not otherwise taken into account in this Section and (iv) with respect to Plymouth, cash paid to Plymouth by Dynamic or its principals subject to (and in accordance with) the provisions of Section 6.1(a) below. If any property other than cash is distributed to a Member, the Capital Accounts of the Members shall be adjusted as if such property had instead been sold by the Company for a price equal to its fair market value, the gain or loss allocated pursuant to Section 7, and the proceeds distributed. No Member shall be obligated to restore any negative balance in its Capital Account. No Member shall be compensated for any positive balance in its Capital Account except as otherwise expressly provided herein. The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with the provisions of Regulations Section 1.704-1(b)(2) and shall be interpreted and applied in a manner consistent with such Regulations.

(b)   The Capital Accounts of the Members shall be increased or decreased in accordance with Treasury Regulations § 1.704 1(b)(2)(iv)(f) to reflect a revaluation of the property of the Company on the Company's books as of the following times: (i) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a de minimis capital contribution; (ii) the distribution by the Company to a Member of more than a de minimis amount of money or other property as consideration for an interest in the Company; (iii) the grant of an interest in the Company (other than a de minimis interest) as consideration for the provision of services to or for the benefit of the Company by an existing Member, or by a new Member in anticipation of becoming a Member; and (iv) the liquidation of the Company within the meaning of Treasury Regulations § 1.704-l(b)(2)(ii)(g); provided, however, that adjustments pursuant to clauses (i), (ii) and (iii) above shall be made only if the Manager reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company.

5.7.   New Members. The Company, at the written direction of the Management Committee, may issue additional Interests and thereby admit a new Member or Members, as the case may be, to the Company, only if such new Member (i) has funded to the Company the Capital Contribution required to be made by such new Member as determined by the Management Committee, (ii) has agreed in writing to be bound by the terms of this Agreement by becoming a party hereto, and (iii) has delivered such additional documentation as the Manager shall reasonably require to so admit such new Member to the Company. A new Member may not be admitted to the Company if the Company would, or may, have in the aggregate more than one hundred (100)

members.  For purposes of determining the number of members under this Section, a Person (the "**beneficial owner**") indirectly owning an interest in the Company through a partnership, grantor trust or S corporation (as such terms are used in the Code) (the "**flow-through entity**") shall be considered a member, but only if (i) substantially all of the value of the beneficial owner's interest in the flow-through entity is attributable to the flow-through entity's interest (direct or indirect) in the Company and (ii) in the sole discretion of the Manager, a principal purpose of the use of the flow-through entity is to permit the Company to satisfy the 100-member limitation.

Section 6.    Distributions.

6.1.    Distribution of Distributable Funds.  The Manager shall calculate and determine the amount of Distributable Funds for each applicable period, after consultation with the Management Committee.  Except as otherwise provided hereunder or determined by the Manager, Distributable Funds, if any, shall be distributed to the Members on a calendar-quarter basis.  Except as provided in Sections 5.2(b), 6.2, 9.9 or 13.3 or as otherwise provided hereunder, such Distributable Funds shall be distributed to the Members as follows:

(a)    first, 100% of such Distributable Funds to the Members, until each Member has received aggregate distributions pursuant to this Section 6.1 in an aggregate amount equal to their total Capital Contributions together with an Internal Rate of Return thereon equal to ten percent (10%), provided, however, should such total distribution not be made within the first 24 months following the Effective Date of this Agreement, the Internal Rate of Return for any remaining balance shall be compounded annually from and after the expiration of the first 24 month period; and provided further that distributions that would have been made to Dynamic pursuant to this Section 6.1(a) shall instead be made to Plymouth until Plymouth has received the aggregate sum of (i) $2,315,000.00; and (ii) interest on the sum of $2,315,000.00 calculated at the rate of ten percent (10%) per annum from the Effective Date (such aggregate sum, the "**Plymouth Required Payment**"); provided that any payments made by or on behalf of Dynamic Star or its direct or indirect principals to Plymouth (i.e., which monies are not distributions of Distributable Funds from the Company; collectively, "**Supplemental Payments**") shall be credited toward the Company's obligation to repay the Plymouth Required Payment;

(b)    second, the balance, if any, of such Distributable Funds remaining after the distributions pursuant to Section 6.1(a) shall be distributed as follows:  (i) forty percent (40%) of such Distributable Funds to Namdar, and (ii) sixty percent (60%) of such distributable funds to Dynamic, subject to any applicable adjustments in Percentage Interest as set forth in Section 5.2.

(c)    Notwithstanding the forgoing, (i) in the event of a Percentage Interest increase or decrease, pursuant to Section 5 of the Agreement, distributions to the Members will be correspondingly adjusted to reflect such increased or decreased percentage Interest, as applicable; and (ii) so long as any portion of the Plymouth BCP Distribution (as hereinafter defined) is not paid to Plymouth as and when due in accordance with this Agreement, and for so long as any portion thereof remains outstanding, the Company shall not distribute any Distributable Funds to Dynamic in accordance with Sections 6.1(a) or 6.1(f).

6.2.    <u>Distribution Priority for Indemnities</u>.  Any distributions or other amounts otherwise payable to a Member under this Agreement shall be applied first to satisfy amounts due and payable on account of the indemnity and/or contribution obligations and/or any other obligations of such Member (or its Affiliates) under this Agreement and/or any other agreement delivered by such Member (or its Affiliates) to the Company or any other Member (or its Affiliates) but shall be deemed distributed or paid, as the case may be, to such Member for purposes of this Agreement.

6.3.    <u>Distributions in Kind</u>.    Subject to the approval of the Management Committee, Distributable Funds may be distributed to the Members in cash, or in kind, and the Members may be compelled to accept a distribution of any asset in kind even if the percentage of that asset distributed to it exceeds a percentage of that asset that is equal to the percentage in which such Member shares in distributions from the Company.  In the case of all assets to be distributed in kind, the amount of the distribution shall equal the net fair market value of the asset distributed as reasonably determined by the Management Committee.  In the case of any distribution of publicly traded property, the net fair market value of such property shall be deemed to be the average closing price for such property for the thirty (30) day period immediately prior to the distribution, or if such property has not yet been publicly traded for thirty (30) days, the average closing price of such property for the period prior to the distribution in which the property has been publicly traded.

6.4    <u>Plymouth BCP Distribution</u>.  (a)   In the event that after any audit the MDBZJGGS LLC actually receives "Qualified Tangible Property" tax credits under the New York State Brownfield Program (collectively "**<u>Gross BCP Credits</u>**"), sixty (60) days after receipt of such Gross BCP Credits, Plymouth shall receive a cash distribution from the Company equal to fifty percent (50%) of such Gross BCP Credits less a deduction for the following sums: (1) Federal Income Taxes; and (2) the costs expended on curing and resolving any violations of Environmental Law on or originating from the Properties, including, but not limited to, those related to wetlands, wetland adjacent areas, surface waters, stormwater discharges and hazardous, regulated and solid waste (which costs shall include without limitation legal, engineering/consulting, government oversight and fines, fees and penalties) (the "**<u>Plymouth BCP Distribution</u>**").

(b)    Notwithstanding anything in this Agreement to the contrary, prior to the payment in full of the Plymouth BCP Distribution, in conjunction with any sale or transfer of all or substantially all of the Properties and/or the Company (as applicable) MDBZJGGS LLC must retain a right to receive not less than fifty percent (50%) of the Gross BCP Credits to which MDBZJGGS LLC is entitled with respect to the Properties from such purchaser or transferee. If and when received, the Company shall be obligated to use those Gross BCP Credits retained in accordance with the prior sentence first to make the balance of the Plymouth BCP Distribution, and the balance (if any) shall be paid pro rata to the Members.

(c)    In the event that the Company does not have sufficient funds to pay the Plymouth BCP Distribution and must make a call for additional capital in accordance with Section 5.2, such additional capital will be contributed solely by Dynamic, and Namdar shall have no obligation to contribute any amount of additional capital in connection with the Plymouth BCP Distribution.

6.5     Redemption of a Portion of the Plymouth Interest.

(a)     Provided and upon the express condition that the Plymouth Required Payment shall be paid in full to Plymouth, whether by distributions of Net Cash Flow from the Company in accordance with Section 6.1 and/or by Supplemental Payments, on or before December 31st 2022 (the "**Redemption Date**"), **time being of the essence**, the Company shall automatically (and without notice to, or further action by, any Member or other party) redeem (for no additional consideration or compensation) 2.5% of Plymouth's aggregate Membership Interest in the aggregate and distribute such Membership Interest to Dynamic (the "**Redemption**"). Following the Initial Redemption (if at all), Plymouth shall own a 2.5% Membership Interest in the Company and Dynamic shall own a _____% Membership Interest in the Company, and each of their respective capital accounts shall be modified accordingly to reflect such redemption. Notwithstanding the foregoing, in the event that the Initial Redemption shall occur, Plymouth agrees to provide such reasonable cooperation as required by the Company or the Manager and to execute such other and further documentation as reasonably required by the Company or the Manager shall require to memorialize and/or effectuate the Initial Redemption.

(b)     Notwithstanding the foregoing, in the event that the Redemption does not occur, by the Redemption Date, interest will accrue annually on the Plymouth Required Payment at the Loan Default Rate, and will accrue interest at such rate until the Plymouth Required Payment is made in full.

(c)     In the event that DS Fordham Landing 1 LLC ("**DSFL1**"), an Affiliate of the Company, sells that certain parcel of real property located at and commonly known as 320 West Fordham Road, Bronx, New York ("**La Salla**"), the Plymouth Required Payment shall be made fifteen (15) Business Days after DSFL1 actually receives payment in connection with the sale of La Salla. If payment is not made, the Plymouth Required Payments shall accrue interest at the Loan Default Rate.

(d)     For the avoidance of doubt, in the event that the Plymouth Required Payment is not made in full on or before the Redemption Date, **time being of the essence,** there shall be no redemption of any portion of Plymouth's Membership Percentage in the Company.

Section 7.    Allocations.

7.1.    Allocation of Net Income and Net Losses Other than in Liquidation.  Except as otherwise provided in this Agreement, Net Income and Net Losses of the Company for each Fiscal Year shall be allocated among the Members in a manner such that, as of the end of such Fiscal Year and taking into account all prior allocations of Net Income and Net Losses of the Company and all distributions made by the Company through such date, the Capital Account of each Member is, as nearly as possible, equal to the distributions that would be made to such Member pursuant to Section 6 if the Company were dissolved, its affairs wound up and assets sold for cash equal to their book value, all Company liabilities were satisfied, and the net assets of the Company were distributed in accordance with Section 6 immediately after such allocation.

7.2.    Other Allocation Provisions. (a)(i)  If there is a net decrease in "partnership minimum gain" (within the meaning of Regulation § 1.704-2(d)) with respect to a

Company for a Fiscal Year, then there shall be allocated to each Member items of income and gain for that year equal to that Member's share of the net decrease in partnership minimum gain (within the meaning of Treasury Regulations § 1.704-2(g)(2)), subject to the exceptions set forth in Treasury Regulations § 1.704-2(f)(2) and (3). The foregoing is intended to be a "minimum gain chargeback" provision as described in Treasury Regulations § 1.704-2(f) and shall be interpreted and applied in all respects in accordance with that Treasury Regulation.

If during a Fiscal Year there is a net decrease in "partner nonrecourse debt minimum gain" (as determined in accordance with Treasury Regulations § 1.704-2(i)(3)), then, in addition to the amounts, if any, allocated pursuant to the preceding paragraph, any Member with a share of that partner nonrecourse debt minimum gain (determined in accordance with Treasury Regulations § 1.704-2(i)(5)) as of the beginning of the Fiscal Year shall, subject to the exceptions set forth in Treasury Regulations § 1.704-2(i)(4), be allocated items of income and gain for the year (and, if necessary, for succeeding years) equal to that Member's share of the net decrease in the partner nonrecourse debt minimum gain. The foregoing is intended to be the "chargeback of partner nonrecourse debt minimum gain" required by Treasury Regulations § 1.704-2(i)(4) and shall be interpreted and applied in all respects in accordance with that Treasury Regulation.

(b)    Notwithstanding any other provision herein to the contrary, no Net Losses (or item of loss or deduction) of the Company shall be allocated to a Member if such allocation would result in a deficit balance in such Member's Capital Account. Such Net Losses (or item of loss or deduction) shall be allocated among the Members whose Capital Account balances are positive in proportion to such positive balances to the extent necessary to reduce the balances of such other Members' positive Capital Accounts to zero, it being the intention of the Members that no Member's Capital Account shall fall below zero while any other Member's Capital Account has a positive balance. For this purpose, a Member's Capital Account shall be increased by the amount, if any, that such Member is obligated (or is deemed to be obligated) to contribute subsequently to the capital of the Company as determined under Regulation §§ 1.704-1(b)(2)(ii)(c) and 1.704-2(g) or otherwise under this Agreement.

(c)    Notwithstanding any other provision herein to the contrary, if a Member unexpectedly receives an adjustment, allocation, or distribution described in Regulation §§ 1.704-(b)(2)(ii)(d)(4), (5), or (6), such Member shall be allocated items of income (including gross income) and gain (after the allocations required by Section 7.2(a) hereof but before any other allocation required by this Section 7) in an amount and in a manner sufficient to eliminate any deficit balance in its Capital Account as quickly as possible. For this purpose, a Member's Capital Account shall be increased by the amount, if any, that such Member is obligated (or is deemed to be obligated) to contribute subsequently to the capital of the Company as determined under Treasury Regulations §§ 1.704-1(b)(2)(ii)(c) and 1.704-2(g). This Section 7.2(c) is intended to constitute a "qualified income offset" within the meaning of Treasury Regulations § 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

(d)    To the extent an adjustment to the adjusted basis of any Company asset pursuant to Section 734(b) or Section 743(b) of the Code is required to be taken into account in determining Capital Accounts pursuant to Regulations § 1.704-1(b)(2)(iv)(m), the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be allocated to

the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to Regulations § 1.704-1(b)(2)(iv)(m).

(e)    To the extent that any item of income, gain, loss or deduction has been specially allocated pursuant to paragraphs (a), (b), (c) or (d) of this Section 7.2 and such allocation is inconsistent with the way in which the same amount otherwise would have been allocated under Section 7.1, subsequent allocations under Section 7.1 shall be made, to the extent possible and without duplication, in a manner which negates as rapidly as possible the effect of all such inconsistent allocations under said paragraph (a), (b), (c) or (d).

(f)    Except to the extent otherwise required by the Code and Treasury Regulations, if an Interest in the Company or part thereof is transferred in any Fiscal Year, the items of income, gain, loss, deduction and credit allocable to the Interest in the Company for such Fiscal Year shall be allocated to the Person who held the Interest in the Company on the date such items were realized or incurred by the Company, based upon the closing of the books method of allocation. The record date for admission of new Members to the Company for income tax purposes may be selected by Manager under any reasonable convention consistently applied, and items of taxable income and loss allocated to them based upon the closing of the books method of allocation for the period subsequent to the date of admission.

(g)    Nonrecourse deductions of the Company, as defined in Treasury Regulations §1.704-2(b) shall be allocated among the Members in accordance with their respective Percentage Interests. These provisions shall be applied as if all distributions and allocations were made at the end of the Fiscal Year, including distributions of any Available Cash made in a subsequent Fiscal Year.

7.3.    <u>Allocations for Income Tax Purposes</u>. (a)    Subject to Section 7.3(b), the income, gains, losses, deductions and credits of the Company for Federal, state and local income tax purposes shall be allocated in the same manner as the corresponding items entering into the computation of Net Income and Net Losses were allocated pursuant to Sections 7.1 and 7.2.

(b)    Code Section 704(c). In accordance with Code Section 704(c) and the Treasury regulations promulgated thereunder, income and loss with respect to any property contributed to the capital of the Company shall, solely for U.S. Federal income tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for U.S. Federal income tax purposes and its Agreed Upon Value at the time of contribution. Such allocation shall be made in accordance with the remedial method set forth in Regulations Section 1.704-3(d).

(c)    Any elections or other decisions relating to such allocations (or any allocations required by this Agreement) shall be made by Manager in any manner that reasonably reflects the purpose and intention of this Agreement. Allocations pursuant to this Section 7.3 are solely for purposes of U.S. Federal, state and local income taxes and shall not affect, or in any way be taken into account in computing, any Member's share of Net Income, Net Losses, other items or distributions pursuant to any provisions of this Agreement.

<u>Section 8.    Books, Records, Tax Matters and Bank Accounts</u>.

-11-

8.1.    <u>Books and Records</u>.  The books and records of account of the Company, together with all items set forth in Section 1102 of the Act, shall be maintained in accordance with standard accounting principles in the United States, consistently applied, and shall be reconciled to comply with the methods followed by the Company for U.S. Federal income tax purposes, consistently applied.  The books and records shall be maintained at the Company's principal office or at a location designated by the Manager, and all such books and records (and the dealings and other affairs of the Company and the Subsidiaries) shall be available to any Member at such location for review, investigation, audit and copying, at such Member's sole cost and expense, during normal business hours on at least twenty-four (24) hours prior notice.

8.2.    <u>Reports and Financial Statements</u>.  Within ninety (90) days after the end of each taxable year of the Company or as soon as available, the Manager shall cause to be sent to each Person who was an Economic Interest Holder at any time during the taxable year then ended, tax information concerning the Company which is necessary for preparing the Economic Interest Holder's income tax returns for that year.  In addition, the Manager shall furnish to the Members such other information, statements, and reports as the Manager shall reasonably determine.  The expenses incurred in connection with the preparation of such reports and statements shall be reimbursed by the Company to the Manager (or its Affiliates performing such services).

8.3.    <u>Partnership Representative</u>.  Dynamic shall serve as the "partnership representative" (within the meaning of Section 6223(a) of the Code, as amended by Title XI of the Bipartisan Budget Act of 2015 (such Title XI, including the corresponding provisions of the Code impacted thereby, and any corresponding provisions of state or local income tax law, as the same may be amended from time to time, the ("**<u>BB Act</u>**")) (any Person so designated as the "partnership representative" is referred to herein as the "**<u>Company Representative</u>**").  The Company Representative is authorized to take such actions and to execute and file all statements and forms on behalf of the Company which may be permitted or required by the applicable provisions of the Code, as amended by the BB Act, or the Treasury Regulations.  The Company Representative shall have the sole authority to act on behalf of the Company under the Code, as amended by the BB Act, and in any examinations of the Company's affairs by tax authorities, including administrative and judicial proceedings ("**<u>Tax Proceedings</u>**") brought by other taxing authorities, and the Company and all the Economic Interest Holders shall be bound by the actions taken by the Company Representative in such capacity. In the event of an audit by the Internal Revenue Service, the Manager shall have the right to cause the Company to make an election under Section 6221(b) (if available) or Section 6226 of the Code (as amended by the BB Act and as thereafter amended) with respect to any Company taxable year.

If the Company Representative makes a timely election under Section 6226(a) of the Code (as amended by the BB Act and as thereafter amended), the Company Representative shall furnish to each Economic Interest Holder (or former Economic Interest Holder) for the year under audit a statement reflecting the Economic Interest Holder's (or former Economic Interest Holder's) share of the adjusted items as determined in the notice of final partnership adjustment, and each such Economic Interest Holder (or former Economic Interest Holder) shall take such adjustment into account as required under Section 6226(b) of the Code, as amended by the BB Act, and shall be liable for any related interest, penalty, addition to tax, or additional amounts.

If and to the extent the Company Representative does not elect to have Section 6226 of the Code (as amended by the BB Act and as thereafter amended) apply to any adjustment, the Company shall make any payments of assessed amounts under Section 6221 of the Code (as amended by the BB Act and as thereafter amended) and shall allocate any such assessment among the current or former Economic Interest Holders of the Company for the "reviewed year" to which the assessment relates in a manner that reflects the current or former Economic Interest Holders' respective interests in the Company for that reviewed year based on such Economic Interest Holder's share of such assessment as would have occurred if the Company had amended the tax returns for such reviewed year and such Economic Interest Holder incurred the assessment directly (using the tax rates applicable to the Company under Section 6225(b) of Code, as amended by the BB Act). To the extent that the Company is assessed amounts under Section 6221(a) of the Code, as amended by the BB Act, each current or former Economic Interest Holder to which this assessment relates shall pay to the Company such Economic Interest Holder's share (as determined by the Company Representative, in its sole good faith discretion and after consulting with the Company's tax advisors) of the assessed amounts, including such Economic Interest Holder's share of any additional accrued interest assessed against the Company relating to such Economic Interest Holder's share of the assessment, upon thirty (30) days of written notice from the Company Representative requesting the payment.

The Company Representative shall, within fifteen (15) Business Days of receipt thereof, forward to the Members a copy of any correspondence relating to the Company received from the Internal Revenue Service which relates to matters that are of material importance to the Company and/or its Members. The Company Representative shall, within fifteen (15) Business Days thereof, advise each Member in writing of the substance of any conversation held with any representative of the Internal Revenue Service which relates to matters that are of material importance to the Company and/or its Members. Any expenses and fees incurred by the Company Representative in connection with any Tax Proceedings, including costs of retaining accountants, lawyers and/or other professionals, shall be expenses of the Company. Any resignation by Dynamic as Company Representative shall require at least thirty (30) days advance written notice to the Members. In such event, a new Company Representative shall be appointed by the Namdar Member.

The provisions regarding limitation of liability and indemnification set forth in Section 14 shall be fully applicable to the Company Representative in its capacity as such. The provisions contained in this Section 8.3 shall survive the dissolution of the Company and the withdrawal of any Economic Interest Holder or the assignment of any Economic Interest Holder's interest in the Company.

8.4.    Bank Accounts.  All funds of the Company are to be deposited in the Company's name in such bank account or accounts as may be designated by the Manager. Funds expended by the Company in accordance with the Annual Business Plan shall be withdraw on the signature of the Dynamic Representative. Funds expended by the Company that are not in accordance with the Annual Business Plan  shall be withdrawn on the signature of both the Namdar Representative and the Dynamic Representative.

8.5.    Tax Returns.  The Manager shall prepare or cause to be prepared (in consultation with ) all income and other tax returns of the Company and the Subsidiaries required by applicable law and shall submit such returns to the Members for their review, comment and

approval at least thirty (30) days prior to the due date thereof (but in no event later than March 15 of each year for the preceding Fiscal Year) and, upon receipt of such approval, shall thereafter cause the same to be filed in a timely manner (including extensions). No later than June 1 of each year with respect to the preceding Fiscal Year, the Manager shall deliver or cause to be delivered to each Member a copy of the tax returns for the Company and each Subsidiary with respect to such Fiscal Year, together with such information with respect to the Company and such Subsidiaries as shall be necessary for the preparation by each Member of its U.S. Federal and state income or other tax and information returns.

<u>Section 9.</u>    <u>Management and Operations.</u>

9.1.    <u>Management</u>.    Subject to the terms of this Agreement, the business operations and affairs of the Company shall be managed exclusively by the Manager, which shall have the authority to exercise all of the powers and privileges granted to a "manager" by the Act, any other law or this Agreement, including, without limitation, all powers which a limited liability company may possess under the Act, together with any powers incidental thereto, and to take any other action not prohibited under the Act or other applicable law, so far as such powers or actions are necessary or convenient or related to the conduct, promotion or attainment of the business, purposes or activities of the Company. The Manager shall be DS 3.

(a)    Notwithstanding the foregoing or anything in this Agreement to the contrary, no act shall be taken, sum expended, decision made or obligation incurred by the Company (and the Company shall not permit any act to be taken, sum expended, decision made or obligation incurred by any Subsidiary) with respect to Major Decisions (as set forth on Exhibit C) without the express approval of the Management Committee and all Major Decisions shall be made solely by the Management Committee after presentation by any Representative to the Management Committee of such Major Decision.

(b)    The provisions of this Agreement regarding the management and governance of the Company shall, to the fullest extent legally permissible, apply as well to the management and governance of the Subsidiaries, whether such Subsidiaries are managed or controlled directly or indirectly by the Company as a member, partner, stockholder or otherwise. Any action to be taken by any Subsidiary shall be construed as an action taken by the Company and shall be subject to the same rights and limitations granted and imposed on the Members under this Agreement.

(c)    The Manager may appoint individuals to act on behalf of the Company or any Subsidiary with such titles and authority as determined from time to time by the Manager. Each of such individuals shall hold office until his or her death, resignation or removal by either of the Manager. Manager shall have the right, at any time in its sole discretion, upon written notice to such Person, to reduce, eliminate or modify such authority granted to such Person or to relieve such Person of such authority and exercise such authority itself or assist or grant such authority to another Person.

9.2.    <u>Management Committee</u>.    (a)    The Members hereby establish a management committee (the "**<u>Management Committee</u>**"). The Management Committee shall consist of two (2) individuals (the "**<u>Representatives</u>**") as follows: (i) Namdar shall be entitled to

designate one (1) representative to represent Namdar (the "**Namdar Representative**"); and (ii) Dynamic shall be entitled to designate one (1) representative to represent Dynamic (the "**Dynamic Representative**" and, together with the Namdar Representative, the "**Representatives**").  The initial Representatives are set forth on <u>Exhibit A</u>.

(b)   Each Representative on the Management Committee shall hold office until his or her death, resignation or removal at the pleasure of the Person that appointed him or her. If a vacancy occurs on the Management Committee, the Person with the right to appoint and remove such vacating Representative shall appoint his or her successor.  A Person shall lose its right to have Representatives on the Management Committee, and its Representatives on the Management Committee shall be deemed to be automatically removed, as of the date on which such Member ceases to be a Member (unless such Member ceases to be a Member pursuant to a Transfer of its entire Interest as permitted hereunder to a transferee which is admitted to the Company as a member pursuant to the terms herein, in which event such Member's appointment rights (if any) shall be exercised by such transferee).

(c)   The Management Committee's sole function under this Agreement shall be to vote in respect of Major Decisions and any Other MC Decisions.  The Management Committee shall meet at such times as may be necessary for the conduct of the Management Committee's business on at least five (5) Business Days prior written notice of the time and place of such meeting given by any Representative to all of the other Representatives. Representatives may waive in writing the requirements for notice before, at or after a special meeting, and attendance at such a meeting without objection by a Representative shall be deemed a waiver of such notice requirement.  No such meeting shall be scheduled on a weekend, national holiday or religious holiday.

(d)   The Namdar Representative and the Dynamic Representative shall be required to constitute a quorum for a meeting of the Management Committee.  If any meeting of the Management Committee shall fail to achieve a quorum by reason of the absence of the Namdar Representative, then the Dynamic Representative may adjourn such meeting and provide notice to Namdar that such adjourned meeting has been rescheduled for a date not less than three (3) Business Days following such adjourned meeting.  If the rescheduled meeting of the Management Committee shall fail to achieve a quorum by reason of the absence of the Namdar Representative, then, notwithstanding the first sentence of this paragraph, the rescheduled meeting shall be deemed to have achieved a quorum and no further vote by any Namdar Representative shall be required to approve any action presented to the Management Committee during such rescheduled meeting; (ii) If any meeting of the Management Committee shall fail to achieve a quorum by reason of the absence of the Dynamic Representative, then the Namdar Representative may adjourn such meeting and provide notice to Dynamic that such adjourned meeting has been rescheduled for a date not less than three (3) Business Days following such adjourned meeting.  If the rescheduled meeting of the Management Committee shall fail to achieve a quorum by reason of the absence of the Dynamic Representative, then, notwithstanding the first sentence of this paragraph, the rescheduled meeting shall be deemed to have achieved a quorum and no further vote by the Dynamic Representative shall be required to approve any action presented to the Management Committee during such rescheduled meeting;

(e)    Each of the Representatives shall be entitled to cast one (1) vote on any matter that comes before the Management Committee.  Except as provided in Section 9.4 or otherwise specifically set forth herein, no action by the Management Committee of any matter shall be the valid, binding action of the Management Committee unless such action is in accord with (whether for or against) the affirmative vote (including votes cast by proxy) of both Representatives.

(f)    If the Management Committee cannot reach agreement (in accordance with the requirements of subparagraphs (a) through (e) above, inclusive) with respect to a Major Decision or Other MC Decision after such Major Decision or Other MC Decision was presented by a Representative to the Management Committee for approval (such deadlocked Major Decision or Other MC Decision, a "**Deadlocked Major Decision**"), the Representatives will attempt in good faith to resolve such Deadlocked Major Decision for ten (10) Business Days; provided, however, that if the subject of the Deadlocked Major Decision requires greater urgency, then the Representatives will use such lesser period of time as they reasonably deem appropriate.  During the Lockout Period, if the Representatives cannot agree on any Deadlocked Major Decision, such Deadlocked Major Decision shall be determined by binding arbitration in New York, New York, before an arbitrator appointed by JAMS.  The arbitration will be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures and in accordance with the Expedited Procedures in those Rules.  After the expiration of the Lockout Period, such Deadlocked Major Decision will not be resolved by arbitration and any Representative may provide written notice to the other Representatives exercising the Buy/Sell procedures set forth in Exhibit D.  Notwithstanding the preceding sentence, no Member nor Representative shall be permitted to exercise the Buy/Sell procedures with respect to a Deadlocked Major Decision involving utilization or leasing of the Properties for industrial purposes pursuant to Section 9.10 hereof.

(g)    At the request of either Representative, any meeting of the Management Committee may be held by conference telephone call, video conference or through similar communications equipment by means of which all persons participating in the meeting can communicate with each other.  Participation in a telephonic and/or video conference meeting held pursuant to this Section shall constitute presence in person at such meeting.

(h)    Any action required or permitted to be taken at a meeting of the Management Committee may be taken without a meeting, without prior notice and without a vote if a consent or consents in writing, setting forth the action so taken, shall be signed unanimously by the Representatives.  All consents shall be filed with the minutes of the proceedings of the Management Committee.

(i)    Except as otherwise expressly provided in this Agreement, none of the Representatives (in their capacities as members of the Management Committee only), the Manager or the Members shall have any duties or liabilities to the Company or any other Member (including any fiduciary duties), whether or not such duties or liabilities arise or exist at law or in equity, and each Member hereby expressly waives any such duties or liabilities. This Section shall not eliminate or limit the liability of such Representatives, Manager, or the Members (A) for acts or omissions that involve fraud, intentional misconduct or a knowing and culpable violation of law, (B) for any intentional breach of this Agreement, or (C) for any

transaction not permitted or authorized under or pursuant to this Agreement from which such Representative, Manager or Member derived a personal benefit (that is separate from its interest in Distributions) unless approved in accordance with this Agreement (including, without limitation, Section 9.4). Notwithstanding any duty (including any fiduciary duty) that might otherwise exist at law or in equity, (i) none of the Representatives (in their capacities as members of the Management Committee only), the Manager or the Members may permit or authorize a transaction under or pursuant to this Agreement from which such Representative, Manager or Member derived a personal benefit (that is separate from its interest in Distributions) unless approved in accordance with this Agreement (including, without limitation, Section 9.4), and (ii) if such approval is obtained, such Representative's, Manager's or Member's duty (including any fiduciary duty) shall be completely satisfied with respect to such transaction. Notwithstanding any duty (including any fiduciary duty) that might otherwise exist at law or in equity, the duty of care of each of such Representatives (in their capacities as members of the Management Committee only), the Manager and the Members is to act in good faith and to not act with fraud, intentional misconduct or a knowing and culpable violation of law. Except as provided in this Agreement, notwithstanding any duty (including any fiduciary duty) that might otherwise exist at law or in equity, whenever in this Agreement a Representative of a Member and/or a Member is permitted or required to make a decision affecting or involving the Company, any Member or any other Person, such Representative and/or such Member shall be entitled to consider only such interests and factors as he, she or it desires, including a particular Member's interests, and shall, to the fullest extent permitted by applicable law, have no duty or obligation to give any consideration to any interest of or factors affecting the Company or any Member. Without limiting the forgoing, each Member acknowledges that the exercise of the rights of any Member under this Agreement and the taking of action on behalf of the Company or with respect to the Properties (including, without limitation, with respect to the sale or other disposition of all or any portion of the Properties) may arise at a time when current market conditions and other factors may be materially disadvantageous to the Company or any other Member.

(j)    Except as provided in this Agreement, the liability of Managers and the Representatives for the debts, obligations or liabilities of the Company, in their capacity as such, shall be limited to the fullest extent permitted by the Act. Specifically, and without limitation, each of them shall have no liability, personal or otherwise, for any debts, obligations or liabilities of the Company, whether arising in tort, contract or otherwise, solely by reason of being Manager or Representative or acting or omitting to act in such capacities or participating in any capacity in the conduct of the business of the Company.

(k)    To the fullest extent permitted by the Act, any liability of Manager or Representative to the Company or to the Members for any breach of duty (other than as set forth in Section 9.2(j)) in such capacity is hereby eliminated.

9.3.    Business Plans.  No later than thirty (30) days prior to the end of the then current Fiscal Year, the Manager shall prepare (or cause to be prepared), and shall deliver to the Management Committee for approval, the Annual Business Plan for the development of the Project during the next calendar year (except for the Initial Business Plan, which is set forth in Exhibit E attached hereto). The Annual Business Plan may be updated at such times as may be reasonably determined by Manager. Any material updates of the Annual Business Plan shall require the

-17-

approval of the Management Committee.  The Initial Business Plan and any other annual business plan approved by the Management Committee is referred to herein as the "**Annual Business Plan**".  If any Annual Business Plan is not approved before the beginning of any calendar year, the Annual Business Plan for the previous calendar year (or the Initial Business Plan, if no subsequent Annual Business Plan has been approved) shall remain in effect until an Annual Business Plan is approved.  In such event, if such Annual Business Plan for the previous calendar year sets forth any discretionary expense for such calendar year but does not specify the amount of such expense for the following calendar year, such expense shall be increased by 3% per year until an Annual Business Plan is approved; expenses for non-discretionary expenses, including, but not limited to, real estate taxes, insurance, and any non-discretionary expenses and obligations due pursuant to any agreement previously entered by the Company or any Subsidiary, shall be increased as needed to satisfy such expenses or obligations.

9.4.    Affiliate Transactions; Fees.  (a)  Except as provided in Sections 9.4(b) and 9.4(c) below, no agreement or transaction shall be entered into by the Company or any Subsidiary with a Member or any Affiliate of a Member and no decision shall be made in respect of any such agreement or transaction (including, without limitation, the entering into, enforcement or termination thereof) or any other matter relating to any dealings between the Company or any Subsidiary and such Member or Affiliate unless such agreement, transaction or decision shall have been approved in writing by the Management Committee acting without the Representative or Representatives appointed by the Member which has (or whose Affiliate of such Member has) such interest in such agreement, transaction or other matter.  Without limiting the foregoing, but subject to Sections 9.4(b) and 9.4(c) below, any such agreement, transaction or other matter shall be on terms and conditions at least as favorable to the Company or such Subsidiary, as applicable, as the terms and conditions which would be available in an arm's length transaction with a Person which is not an Affiliate, and the terms and conditions of such agreement, transaction or other matter shall be fully disclosed by the interested Member and the Company to all of the Representatives and the Management Committee prior to the execution, delivery and/or consummation thereof and there shall be a vote by the Management Committee thereon in accordance with the terms of this paragraph.

(b)    The Members hereby agree that none of the following shall constitute a breach of Section 9.4(a) (provided the same are duly authorized in accordance with this Agreement): (i) the Company or a Subsidiary entering into the Development Agreement (and the payment of the Development Fees payable thereunder), (ii) the Company or a Subsidiary paying the fees described in Section 9.4(c) below, and (iii) the Members (or Affiliates, if applicable) making loans to the Company (and the repayment by the Company of such loans) in accordance with the terms provided herein.  Each Member acknowledges that the Members intend for the Company or a Subsidiary to enter into the Development Agreement on terms customary to similarly-situated companies, which shall include the Development Fee, as described in Section 9.4(c) below.

(c)    The Members hereby approve the following ancillary agreements and fees:

(1)    In connection with the development of the Properties, the Company (or a subsidiary) has entered into a Development Agreement (the "**Development Agreement**") with the Manager, which Development Agreement shall provide for the payment to the

Manager of a monthly developer fee (a "**Development Fee**") of One Hundred and Fifty Six Thousand Two Hundred and Fifty Dollars ($156,250.00), which Development Fee shall be paid monthly until November 24, 2023 (the "**Development Fee Period**"). The Development Fee shall be paid to the Manager out of the funds received by the Company from Namdar as Namdar' s Initial Capital Contribution.

(2)     If there is a final unappealable denial of the Rezoning Certification within the Development Fee Period, no further Development Fees will be paid and all amounts of Development Fee paid to the Manager will be credited to Namdar's Capital Account in the Company as set forth in (4) below.

(3)     During the Development Fee Period, if the Rezoning occurs or a sale of the Land takes place, the Company shall pay all accrued but unpaid Development Fee through the date of such Rezoning or sale, and no further Development Fee will be paid to the Manager.

(4)     After the Development Fee Period, if the Rezoning Certification has been withdrawn or denied in a final, non-appealable decision, no further Development Fee will be paid to the Manager and all amounts of Development Fee paid, will have a dilutive effect on the equity position of Dynamic, which said diluted percentage shall be credited to the Namdar Equity/membership interest. For example, Namdar currently has a 57.14% equity interest in the property based on a total project investment of $35,000,000 and an initial capital investment of $20,000,000. In the event that the Development Fee to be credited to Namdar is in the sum of $3,750,000.00, same represents 10.71% of the total investment in the Company. As such Namdar's membership interest would be increased 10.71% to 67.85% and thereafter diluted by the 30% promote fee leaving Namdar a diluted 47.495% equity interest.

9.5.    Other Activities.  Except as provided in Section 9.5(b), neither the Company nor any Member (or any Affiliate of any Member) shall have any right by virtue of this Agreement either to participate in or to share in any other now existing or future ventures, activities or opportunities of any of the other Members or their Affiliates, or in the income or proceeds derived from such ventures, activities or opportunities.

9.6.    Limitation on Actions of Members; Binding Authority.  Other than the Manager, acting in its capacity as the Manager of the Company, no Member shall, without the prior written consent of Manager, take any action on behalf of, or in the name of, or otherwise bind the Company, or enter into any contract, agreement, commitment or obligation binding upon the Company, or, in its capacity as a Member, perform any act in any way relating to the Company or the Company's assets, except in a manner and to the extent specifically authorized by the provisions of this Agreement.

.  The Members acknowledge and agree that the Company may be restructured as a tenancy-in-common to transfer to each direct or indirect Member a direct interest in each of the Properties, such that each direct or indirect Member may utilize IRC Section 1031 Tax Deferred Exchange for such party's benefit.  Each Member agrees to assist and cooperate with the other Members and the Company in such exchange, provided that no Member shall incur liability, cost or expense in

connection with another Member's exchange and will execute any and all documents as are reasonably necessary in connection with such exchange. The Members each hereby agree that each Member shall have the right to cause the Company to make such an election, and, to the extent feasible, such election shall be made to cause only the electing Member's Interest to be converted to a direct tenancy-in-common interest in such Property.

9.8.    FCPA/OFAC.  (a)  In compliance with the Foreign Corrupt Practices Act, each Member will not, and will ensure that its officers, directors, employees, shareholders, members, agents and Affiliates, acting on its behalf or on the behalf of the Company or any Subsidiary or Affiliates of the foregoing do not, for a corrupt purpose, offer, directly or indirectly, promise to pay, pay, promise to give, give or authorize the paying or giving of anything of value to any official representative or employee of any government agency or instrumentality, any political party or officer thereof or any candidate for office in any jurisdiction, except for any facilitating or expediting payments to government officials, political parties or political party officials the purpose of which is to expedite or secure the performance of a routine governmental action by such government officials or political parties or party officials.  The term "routine governmental action" for purposes of this provision shall mean an action which is ordinarily and commonly performed by the applicable government official in (i) obtaining permits, licenses, or other such official documents which such Person is otherwise legally entitled to; (ii) processing governmental papers; (iii) providing police protection, mail pick-up and delivery or scheduling inspections associated with contract performance or inspections related to transit of goods across country; (iv) providing phone service, power and water supply, loading and unloading of cargo, or protecting perishable products or commodities from deterioration; or (v) actions of a similar nature.  The term routine governmental action does not include any decision by a government official whether, or on what terms, to award new business to or to continue business with a particular party, or any action taken by an official involved in the decision making process to encourage a decision to award new business to or continue business with a particular party.

(b)  Each Member agrees to notify immediately the other Member of any request that such Member or any of its officers, directors, employees, shareholders, members, agents or Affiliates, acting on its behalf, receives to take any action that may constitute a violation of the Foreign Corrupt Practices Act.

(c)  None of the Members or any of their Affiliates, nor any of their respective members, and none of their respective officers or directors is, nor during the term of this Agreement while such Member is a Member, will they become, a person or entity with whom U.S. persons or entities are restricted from doing business under regulations of the Office of Foreign Asset Control ("**OFAC**") of the Department of the Treasury (including those named on OFAC's Specially Designated Blocked Persons List) or under any U.S. statute, executive order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit or Support Terrorism) or other governmental action and is not engaged and, during the term of this Agreement, will not, engage in any dealings or transactions with or be otherwise associated with such persons or entities.

9.9.    Development Agreement. The Members acknowledge and agree that upon the Company entering into any development agreement for the Properties, this Agreement will be modified accordingly.

9.10.   <u>Industrial Uses.</u>  Namdar and Dynamic both acknowledge and agree that the company is proceeding to have the Properties rezoned for mixed commercial and residential use. Prior to the Rezoning, if either party seeks to utilize the Properties for industrial purposes (which it is currently zoned for) the decision to allow such use and the stabilized cap rate of any such lease will be a Major Decision.

<u>Section 10.</u>   <u>Confidentiality.</u>  (a)   Any information relating to the business, operation or finances of a Member or the Company which are proprietary to, or considered proprietary by, such Member or the Company; and all information in tangible form (plans, writings (including, without limitation, customer lists and marketing materials), drawings, computer software and programs, etc.) or provided to or conveyed orally or visually to a receiving Member (including, without limitation, any marketing techniques) shall be presumed to be confidential information (collectively referred to as "**Confidential Information**"). Each Member and Representative agrees:  (i) not to disclose such Confidential Information to any Person except to those of its employees or representatives who need to know such Confidential Information in connection with the conduct of the business of the Company and who have agreed to maintain the confidentiality of such Confidential Information and (ii) neither it nor any of its employees or representatives will use the Confidential Information for any purpose other than in connection with the conduct of the business of the Company; provided that nothing herein shall prevent any Member from disclosing any portion of such Confidential Information (1) to the Company and allowing the Company to use such Confidential Information in connection with the Company's business, (2) pursuant to judicial order or in response to a governmental inquiry, by subpoena or other legal process, but only to the extent required by such order, inquiry, subpoena or process, and only after reasonable notice to the original divulging Member, (3) as necessary or appropriate in connection with, or to prevent the audit by, a governmental agency of the accounts of any of the Members, (4) in order to initiate, defend or otherwise pursue legal proceedings between the parties regarding this Agreement, (5) as necessary in connection with a Transfer of an Interest permitted hereunder, provided the recipient agrees to maintain the confidentiality of such Confidential Information, (6) to a Member's respective attorneys or accountants or other representatives, (7) as, and solely to the extent, required by applicable laws or applicable rules and regulations of a stock exchange, provided notice of such disclosure is first given to Manager prior to such disclosure, or (8) to any existing and prospective, direct or indirect, investors, lenders and other capital sources, provided the recipient agrees to maintain the confidentiality of such Confidential Information. Confidential Information shall not include information (1) which is or hereafter becomes public, other than by breach of this Agreement, (2) which was already in the receiving Member's possession prior to any disclosure of the Confidential Information to the receiving Member by the divulging Member, or (3) which has been or is hereafter obtained by the receiving Member from a third party not bound by any confidentiality obligation with respect to the Confidential Information.

(b)   All Confidential Information shall be protected by the receiving Member and the Company from disclosure with the same degree of care with which the receiving Member protects its own Confidential Information from disclosure but in any event using no less than reasonable care.  The Company, the Members and their Affiliates shall each act to safeguard the secrecy and confidentiality of, and any proprietary rights to, the Confidential Information of the Company and the Members, except to the extent such information may be disclosed pursuant to Section <u>10(a)</u> above.  Each Member and the Company may, from time to

time, provide the other Members written notice of any Confidential Information which is subject to this Section.

(c)    References in this Section to the Company shall include any Subsidiary of the Company.

Section 11.  Representations and Warranties.

11.1.    In General.  As of the date hereof, each of the Members hereby makes each of the representations and warranties applicable to such Member as set forth in Section 11.2.  Such representations and warranties shall survive the execution of this Agreement.

11.2.    Representations and Warranties.  Each Member hereby represents and warrants that:

(a)    Due Incorporation or Formation; Authorization of Agreement.  Such Member is a corporation duly organized or a partnership or limited liability company duly formed, validly existing and in good standing under the laws of the jurisdiction of its incorporation or formation and has the corporate, partnership or company power and authority to own its property and carry on its business as owned and carried on at the date hereof and as contemplated hereby.  Such Member is duly licensed or qualified to do business and in good standing in each of the jurisdictions in which the failure to be so licensed or qualified would have a material adverse effect on its financial condition or its ability to perform its obligations hereunder.  Such Member has the corporate, partnership or company power and authority to execute and deliver this Agreement and to perform its obligations hereunder, and the execution, delivery and performance of this Agreement has been duly authorized by all necessary corporate, partnership or company action.  This Agreement constitutes the legal, valid and binding obligation of such Member.

(b)    No Conflict with Restrictions; No Default.  Neither the execution, delivery or performance of this Agreement nor the consummation by such Member (or any of its Affiliates) of the transactions contemplated hereby (i) conflicts or will conflict with, violate or result in a breach of (or has conflicted with, violated or resulted in a breach of) any of the terms, conditions or provisions of any law, regulation, order, writ, injunction, decree, determination or award of any court, any governmental department, board, agency or instrumentality, domestic or foreign, or any arbitrator, applicable to such Member or any of its Affiliates, (ii) conflicts or will conflict with, violate, result in a breach of or constitute a default under (or has conflicted with, violated, resulted in a breach of or constituted a default under) any of the terms, conditions or provisions of the articles of incorporation, bylaws, partnership agreement or operating agreement of such Member or any of its Affiliates or of any material agreement or instrument to which such Member or any of its Affiliates is a party or by which such Member or any of its Affiliates is or may be bound or to which any of its properties or assets is subject, (iii) conflicts or will conflict with, violate, result in (or has conflicted with, violated or resulted in) a breach of, constitute (or has constituted) a default under (whether with notice or lapse of time or both), accelerate or permit the acceleration of (or has accelerated) the performance required by, give (or has given) to others any material interests or rights or require any consent, authorization or approval under any indenture, mortgage, lease, agreement or instrument to which such Member

or any of its Affiliates is a party or by which such Member or any of its Affiliates or any of their properties or assets is or may be bound, or (iv) results or will result (or has resulted) in the creation or imposition of any lien upon any of the properties or assets of such Member or any of its Affiliates.

(c) <u>Governmental Authorizations</u>.  Any registration, declaration or filing with, or consent, approval, license, permit or other authorization or order by, or exemption or other action of, any governmental, administrative or regulatory authority, domestic or foreign, that was or is required in connection with the valid execution, delivery, acceptance and performance by such Member under this Agreement or consummation by such Member (or any of its Affiliates) of any transaction contemplated hereby has been completed, made or obtained on or before the date hereof.

(d) <u>Litigation</u>.    There are no actions, suits, proceedings or investigations pending, or, to the knowledge of such Member or any of its Affiliates, threatened against or affecting such Member or any of its Affiliates or any of their properties, assets or businesses in any court or before or by any governmental department, board, agency or instrumentality, domestic or foreign, or any arbitrator which could, if adversely determined (or, in the case of an investigation could lead to any action, suit or proceeding which if adversely determined) could reasonably be expected to materially impair such Member's ability to perform its obligations under this Agreement or to have a material adverse effect on the consolidated financial condition of such Member; such Member or any of its Affiliates has not received any currently effective notice of any default, and such Member or any of its Affiliates is not in default, under any applicable order, writ, injunction, decree, permit, determination or award of any court, any governmental department, board, agency or instrumentality, domestic or foreign, or any arbitrator which could reasonably be expected to materially impair such Member's (or any of its Affiliate's) ability to perform its obligations under this Agreement or to have a material adverse effect on the consolidated financial condition of such Member.

(e) <u>Investigation</u>.  Such Member is acquiring its Interest based upon its own investigation, and the exercise by such Member of its rights and the performance of its obligations under this Agreement will be based upon its own investigation, analysis and expertise.  Such Member is a sophisticated investor possessing an expertise in analyzing the benefits and risks associated with acquiring investments that are similar to the acquisition of its Interest.

(f) <u>Broker</u>.  Except for Meridian Capital Group LLC, no broker, agent or other person acting as such on behalf of such Member was instrumental in consummating this transaction and no conversations or prior negotiations were had by such party with any broker, agent or other such person concerning the transaction that is the subject of this Agreement.

(g) <u>Investment Company Act</u>.  Neither such Member nor any of its Affiliates is, nor will the Company as a result of such Member holding an interest therein be, an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940, as amended.

(h) <u>Securities Matters</u>.  (i)  None of the Interests are registered under the Securities Act or any state securities laws.  Such Member understands that the offering, issuance and sale of the Interests are intended to be exempt from registration under the Securities Act, based, in part, upon the representations, warranties and agreements contained in this Agreement. Such Member is an "accredited investor" as such term is defined in Rule 501 of Regulation D promulgated under the Securities Act.

(i)     Neither the Securities and Exchange Commission nor any state securities commission has approved the Interests or passed upon or endorsed the merits of the offer or sale of the Interests.  Such Member is acquiring the Interests solely for such Member's own account for investment and not with a view to resale or distribution thereof in violation of the Securities Act.

(ii)    Such Member is unaware of, and in no way relying on, any form of general solicitation or general advertising in connection with the offer and sale of the Interests, and no Member has taken any action which could give rise to any claim by any person for brokerage commissions, finders' fees (without regard to any finders' fees payable by the Company directly) or the like relating to the transactions contemplated hereby.

(iii)   Such Member is not relying on the Company or any of its officers, directors, employees, advisors or representatives with regard to the tax and other economic considerations of an investment in the Interests, and such Member has relied on the advice of only such Member's Advisors.

(iv)    Such Member understands that the Interests may not be sold, hypothecated or otherwise disposed of unless subsequently registered under the Securities Act and applicable state securities laws, or an exemption from registration is available.  Such Member agrees that it will not attempt to Transfer all or any portion of the Interests in violation of this Agreement.

(v)     Such Member has adequate means for providing for its current financial needs and anticipated future needs and possible contingencies and emergencies and has no need for liquidity in the investment in the Interests.

(vi)    Such Member, or its direct or indirect members, partners or shareholders, as applicable, has significant prior investment experience, including investment in non-listed and non-registered securities.  Such Member is knowledgeable about investment considerations and has a sufficient net worth to sustain a loss of such Member's entire investment in the Company in the event such a loss should occur.  Such Member's overall commitment to investments which are not readily marketable is not excessive in view of such Member's net worth and financial circumstances and the purchase of the Interests will not cause such commitment to become excessive.  The investment in the Interests is suitable for such Member.

(vii)    Such Member represents to the Company that the information contained in this subparagraph (h) and in all other writings, if any, furnished to the Company with regard to such Member (to the extent such writings relate to its exemption from registration under the Securities Act) is complete and accurate and may be relied upon by the Company in determining the availability of an exemption from registration under Federal and state securities laws in connection with the sale of the Interests.

Section 12.    Sale, Assignment, Transfer or other Disposition.

12.1.    Prohibited Transfers.  Except as otherwise provided in this Section 12 or approved in writing by the Management Committee, no Member shall (i) Transfer, directly or indirectly, all or any part of its Interest (whether legal or beneficial) in the Company or (ii) permit any Transfer, directly or indirectly of all or any part of any interest in such Member, and any attempt to so Transfer such Interest or such interest in a Member (and such Transfer) in violation of this Section 12.1 shall be null and void and of no effect.

12.2.    Permitted Transfers.

(a)    Dynamic Permitted Transfers.

(1)    Dynamic may Transfer its Interests in the Company at any time to any Dynamic Permitted Transferee provided such Person remains a Dynamic Permitted Transferee at all times while such Person holds such Interests.  If any such Person subsequently ceases to be a Dynamic Permitted Transferee while such Person holds such Interests, such Person shall, before ceasing to be a Dynamic Permitted Transferee, Transfer such Interests to Dynamic or a Dynamic Permitted Transferee.  Any failure to comply with the immediately preceding sentence will result in such cessation being a non-permitted Transfer.

(2)    Nothing in this Agreement shall restrict any indirect Transfers of interests in Dynamic so long as following such Transfer no Dynamic Change of Control shall have occurred. Dynamic shall have the right to interpose a new entity between Dynamic and the Company, following which the Dynamic Change of Control requirement shall apply to such new entity instead of Dynamic.

(b)    Namdar Permitted Transfers.

(1)    Namdar may Transfer its Interests in the Company at any time to any Namdar Permitted Transferee provided such Person remains a Namdar Permitted Transferee at all times while such Person holds such Interests.  If any such Person subsequently ceases to be a Namdar Permitted Transferee while such Person holds such Interests, such Person shall, before ceasing to be a Namdar Permitted Transferee, Transfer such Interests to Namdar or a Namdar Permitted Transferee.  Any failure to comply with the immediately preceding sentence will result in such cessation being a non-permitted Transfer.

(2)    Nothing in this Agreement shall restrict any indirect Transfers of interests in Namdar so long as following such Transfer no Namdar Change of Control shall have occurred. Namdar shall have the right to interpose a new entity between Namdar and the Company, following

which the Namdar Change of Control requirement shall apply to such new entity instead of Namdar.

(c)    <u>Plymouth Permitted Transfers</u>.

(1)    Plymouth may Transfer its Interests in the Company at any time to any Plymouth Permitted Transferee provided such Person remains a Plymouth Permitted Transferee at all times while such Person holds such Interests.  If any such Person subsequently ceases to be a Plymouth Permitted Transferee while such Person holds such Interests, such Person shall, before ceasing to be a Plymouth Permitted Transferee, Transfer such Interests to Plymouth or a Plymouth Permitted Transferee.  Any failure to comply with the immediately preceding sentence will result in such cessation being a non-permitted Transfer.

(2)    Nothing in this Agreement shall restrict any indirect Transfers of Interests in Plymouth so long as following such Transfer no Plymouth Change of Control shall have occurred.  Plymouth shall have the right to interpose a new entity between Plymouth and the Company, following which the Plymouth Change of Control requirement shall apply to such new entity instead of Plymouth.

12.3.    <u>Admission of Transferee</u>.  (a)  Notwithstanding anything in this Section to the contrary, no Transfer of Interests in the Company shall be permitted unless the potential transferee is admitted as a Member under this Section.  If a Member Transfers all or any portion of its Interest in the Company in accordance with the terms of this Agreement, such transferee may become a Member if (i) such transferee executes and agrees to be bound by this Agreement, (ii) the transferor and/or transferee pays all reasonable legal and other fees and expenses incurred by the Company in connection with such assignment and substitution and (iii) the transferor and transferee execute such documents and deliver such certificates to the Company and the remaining Members as may be required by applicable law or otherwise reasonably advisable by Manager.  Without limiting the foregoing, unless a transferee of a Member's Interest is admitted as a Member under this Section, it shall have none of the powers of a Member hereunder and shall only have such rights of an assignee under the Act as are consistent with the other terms and provisions of this Agreement.  If a transferee of a Member's Interest is not admitted as a Member under this Section, the transferor shall retain all noneconomic rights of a Member, including, without limitation, the power to vote such Member's Interest on all matters coming before the Member's for a vote.  Upon the Transfer of its entire Interest in the Company and the admission of such Member's transferee(s) pursuant to this Section, a Member shall be deemed to have withdrawn from the Company as a Member.

(b)    Notwithstanding the foregoing, any Transfer or purported Transfer of any Interest, whether to another Member or to a third party, shall be of no effect, and such transferee shall not become a Member, if either party determines (acting reasonably, prior to or within thirty (30) days of written notice of the Transfer from the transferring Member) that:

(i)    the Transfer would require registration of any Interest under, or result in a violation of, any Federal or state securities laws;

(ii) as a result of such Transfer the Company would be required to register as an investment company under the Investment Company Act of 1940, as amended, or any rules or regulations promulgated thereunder;

(iii) if as a result of such Transfer the aggregate value of Interests held by "**benefit plan investors**" including at least one benefit plan investor that is subject to ERISA, could be "significant" (as such terms are defined in U.S. Department of Labor Regulation 29 C.F.R. 2510.3-101(f)(2)) with the result that the assets of the Company could be deemed to be "plan assets" for purposes of ERISA; or

(iv) as a result of such Transfer, the Company would or may have in the aggregate more than one hundred (100) members and material adverse Federal income tax consequences would result to a Member. For purposes of determining the number of members under this Section, a Person (the "**beneficial owner**") indirectly owning an interest in the Company through a partnership, grantor trust or S corporation (as such terms are used in the Code) (the "**flow-through entity**") shall be considered a member, but only if (i) substantially all of the value of the beneficial owner's interest in the flow through entity is attributable to the flow-through entity's interest (direct or indirect) in the Company and (ii) in the sole discretion of Manager, a principal purpose of the use of the flow-through entity is to permit the Company to satisfy the 100 member limitation.

Manager may require the provision of a certificate as to the legal nature and composition of a proposed transferee of an Interest of a Member and from any Member as to its legal nature and composition and shall be entitled to rely on any such certificate in making such determinations under this Section.

12.4. <u>Withdrawals and Withdrawing Members</u>. (a) Each of the Members does hereby covenant and agree that it will not withdraw, resign, retire or disassociate from the Company, except as a result of a Transfer of its entire Interest in the Company permitted under the terms of this Agreement to a transferee that is admitted as a member of the Company pursuant to Section 12.3, and that it will carry out its duties and responsibilities hereunder until the Company is terminated, liquidated and dissolved under Section 13. No Member shall be entitled to receive any distribution or otherwise receive the fair market value of its Interest in compensation for any purported resignation or withdrawal not in accordance with the terms of this Agreement.

(b) Upon the death, disability, winding up and termination (in the case of a Member that is a partnership or a limited liability company), dissolution and termination (in the case of a Member that is a corporation), or withdrawal in contravention of Section 12.4(a) of a Member, or the occurrence of a Bankruptcy/Dissolution Event with respect to a Member (the "**Withdrawing Member**"), the Withdrawing Member shall cease to be a member of the Company and the other Member shall, subject to this Section, have the right to treat such successor(s) in interest as assignees of the Interest in the Company of the Withdrawing Member, with only such rights of an assignee of a limited liability company interest under the Act as are consistent with the other terms and provisions of this Agreement and with no other rights under

this Agreement. Without limiting the generality of the foregoing, the successor(s) in interest of the Withdrawing Member shall only have the rights to distributions provided in Sections 6 and 13.3(d), unless otherwise waived by the other Member in its sole discretion. For purposes of this Section, if the Withdrawing Member's Interest in the Company is held by more than one Person (for purposes of this subparagraph, the "**Assignees**"), the Assignees shall appoint one Person with full authority to accept notices and distributions with respect to such Interest in the Company on behalf of the Assignees and to bind them with respect to all matters in connection with the Company or this Agreement.

12.5.    Subsidiary Transfer Restrictions.  Each Member and Representative shall take such action as may be necessary and appropriate to permit or cause any Subsidiary to permit a Transfer that would otherwise be permitted pursuant to the terms of this Agreement.

Section 13.  Dissolution.

13.1.    Limitations.  The Company may be dissolved, liquidated and terminated only pursuant to the provisions of this Section, and, to the fullest extent permitted by law but subject to the terms of this Agreement, the parties hereto do hereby irrevocably waive any and all other rights they may have to cause a dissolution of the Company or a sale or partition of any or all of the Company's assets. Notwithstanding the foregoing, or any other provision of this Section 13 to the contrary, until the Obligations are indefeasibly paid in full, the Company shall not dissolve without the written consent of Preferred Investor.

13.3.    Exclusive Events Requiring Dissolution.  The Company shall be dissolved only upon the earliest to occur of the following events (a "**Dissolution Event**"):

(a)    the expiration of the specific term, if any, set forth in Section 2.5;

(b)    at any time at the election of the Management Committee in writing;

(c)    at any time there are no Members (unless otherwise continued in accordance with the Act); and

(d)    the entry of a decree of judicial dissolution pursuant to the Act.

13.4.    Liquidation.  Upon the occurrence of a Dissolution Event, the business of the Company shall be continued to the extent necessary to allow an orderly winding up of its affairs, including the liquidation of the assets of the Company pursuant to the provisions of this Section, as promptly as practicable thereafter, and each of the following shall be accomplished:

(a)    Manager shall cause to be prepared a statement setting forth the assets and liabilities of the Company as of the date of dissolution, a copy of which statement shall be furnished to all of the Members.

(b)    The property and assets of the Company shall be liquidated or distributed in kind under the supervision of Manager as promptly as possible, but in an orderly, businesslike and commercially reasonable manner.

(c)   Any gain or loss realized by the Company upon the sale of its property shall be deemed recognized and allocated to the Members in the manner set forth in Section 7.2.  To the extent that an asset is to be distributed in kind, such asset shall be deemed to have been sold at its fair market value on the date of distribution, the gain or loss deemed realized upon such deemed sale shall be allocated in accordance with Section 7.2 and the amount of the distribution shall be considered to be such fair market value of the asset.

(d)   The proceeds of sale and all other assets of the Company shall be applied and distributed as follows and in the following order of priority:

(i)     to the satisfaction of the debts and liabilities of the Company (contingent or otherwise) and the expenses of liquidation or distribution (whether by payment or reasonable provision for payment), other than liabilities to Members or former Members for distributions;

(ii)    to the satisfaction of loans made by Members to the Company pursuant to the terms herein in proportion to the outstanding balances of such loans at the time of payment; and

(iii)   the balance, if any, to the Members in accordance with the distribution requirements pursuant to Section 6.

13.5.   Continuation of the Company.  Notwithstanding anything to the contrary contained herein, the death, retirement, resignation, expulsion, bankruptcy, dissolution or removal of a Member shall not in and of itself cause the dissolution of the Company, and the Members are expressly authorized to continue the business of the Company in such event, without any further action on the part of the Members.

Section 14.  Indemnification.

14.1.   Exculpation of Members.   No Member, manager of the Company, Representative or officer of the Company (or their respective agents, officers, directors, members, managers, partners, shareholders or employees) shall be liable to the Company or to the other Members for Damages or otherwise with respect to any actions or failures to act taken or not taken relating to the Company, except in the case of a Member only, to the extent any such Damage results from acts for which such Member is required to provide indemnification against under Section 14.3, but subject in all cases to the provisions of Section 16.12.

14.2.   Indemnification by Company.  The Company, to the fullest extent permitted under Section 420 of the Act, hereby indemnifies, holds harmless and defends the Members, any manager of the Company, the Representatives, the officers of the Company and each of their respective agents, officers, directors, members, partners, shareholders and employees from and against any loss, cost, expense, damage, claim, liability or injury (including but not limited to any judgment, award, settlement, reasonable attorneys' fees and other costs or expenses incurred in connection with the defense of any actual or threatened action, proceeding or claim) (collectively, "**Damages**") suffered or sustained by them by reason of or arising out of (i) their activities on behalf of the Company or in furtherance of the interests of the Company,  (ii) their status as Members, managers, representatives, employees or officers of the Company or any Subsidiary (or

their status as the respective agents, officers, directors, members, managers, partners, shareholders or employees of such Persons), or (iii) the Company's assets, property, business or affairs (including, without limitation, the actions of any officer, director, member or employee of the Company or any Subsidiary), if and to the extent that the acts or omissions are not (A) a breach of any obligation of the Person seeking indemnification under Section 14 (the "Indemnity Claimant"), (B) a breach of any obligation by or any inaccuracy in or breach of any representation or warranty made by the Indemnity Claimant (or any Affiliate of the Indemnity Claimant), whether in this Agreement or in any Collateral Agreement, or (C) fraud, gross negligence or willful or wanton misconduct on the part of, or by, the Indemnity Claimant, such Indemnity Claimant's Representatives (or any other representative appointed by such Indemnity Claimant), or any officer, director, member, partner, shareholder or employee of such Indemnity Claimant or Affiliate of such Indemnity Claimant.  For the purposes of this Section, officers, directors, agents, members, partners, employees and other representatives of Affiliates of a Member who are functioning as representatives of such Member in connection with this Agreement shall be considered representatives of such Member.  Reasonable expenses incurred by the indemnified party in connection with any such proceeding relating to the foregoing matters shall be paid or reimbursed by the Company in advance of the final disposition of such proceeding upon receipt by the Company of (x) written affirmation by the Person requesting indemnification of its good faith belief that it has met the standard of conduct necessary for indemnification by the Company and (y) a written undertaking by or on behalf of such Person to repay such amount if it shall ultimately be determined by a court of competent jurisdiction that such Person has not met such standard of conduct, which undertaking shall be an unlimited general obligation of the indemnified party but need not be secured.  The provisions of this Section <u>14.2</u> shall not apply to any services or acts of a Member, its Affiliates or their agents, officers, directors, members, partners, shareholders and employees, in each case as independent contractors of the Company.

14.3.  <u>General Indemnification by the Members</u>.  (a)  Notwithstanding any other provision contained herein, each Member (the "**Indemnifying Party**") hereby indemnifies and holds harmless the other Members, the Company and each of their Affiliates and their agents, officers, directors, members, managers, partners, shareholders, representatives and employees (each, an "**Indemnified Party**") from and against all Damages as a result of or arising out of (i) any breach of any obligation of the Indemnifying Party under this Agreement, (ii) any breach of any obligation by or any inaccuracy in or breach of any representation or warranty made by the Indemnifying Party (or any Affiliate of the Indemnifying Party), whether in this Agreement or in any Collateral Agreement, or (iii) any fraud, gross negligence or willful or wanton misconduct on the part of, or by, the Indemnifying Party, such Indemnifying Party's Representatives (or any other representative appointed by such Indemnifying Party), or any officer, director, member, partner, shareholder or employee of such Indemnifying Party or Affiliate of such Indemnifying Party. Notwithstanding the foregoing, Plymouth shall not have any obligation pursuant to this Section 14.3 prior to the earlier of (x) payment in full of the Plymouth Required Payment to Plymouth, whether by distributions of Net Cash Flow from the Company in accordance with Section 6.1 and/or by Supplemental Payments, and (y) the Outside Redemption Date; provided that thereafter, the obligations of this Section 14.3 shall immediately become binding upon Plymouth in all respects. In the event that Namdar is the Indemnified Party, any indemnification obligation which Plymouth is not obligated to contribute to in accordance with the forgoing, shall instead be the sole obligation of the Dynamic Member for all purposes hereunder.

(b)    Except as otherwise provided herein or in any other written agreement between and/or among the Company and the Members, in addition to the limitations provided in Section 16.12, recourse for the indemnity obligation of the Members under this Section 14.3 shall be limited to such Indemnifying Party's Interest in the Company; provided, however, that recourse against an Indemnifying Party under its indemnity obligations under this Agreement or otherwise shall be further limited to an aggregate amount equal to the value of the other Member's Interest as determined by and being limited to the then current liquidation value of the other Member's Interest (assuming the Company were liquidated in an orderly fashion and all net proceeds thereof were distributed in accordance with Section 6), in the event the value of the other Member's Interest is less than the value of the Indemnifying Party's Interest.

(c)    The indemnities, contributions and other obligations under this Agreement shall be in addition to any rights that any Indemnified Party may have at law, in equity or otherwise.  The terms of this Section 14 shall survive termination of this Agreement.

Section 15. Limited Power of Attorney.

15.1.    Grant.  Each of the Members does hereby authorize and consent to and does hereby grant to the Manager an irrevocable special limited power of attorney, coupled with an interest, to make, execute, sign, swear to and file in the Member's name, place and stead, (i) the Articles of Organization to be filed in the appropriate offices in the State of New York and in such form as shall be necessary under the laws of said State to give effect to the provisions hereof and to preserve the character of the Company as a limited liability company; (ii) any amendment to the Articles of Organization or to effect any amendment to this Agreement in accordance with the terms hereof; and (iii) all instruments, documents and certificates which may from time to time be required by the laws of the United States of America or the State of New York, or any political subdivision or agency of the foregoing, to effectuate, implement and continue the valid existence of the Company, including the making, execution and filing of the Company's Articles of Organization and any amendments thereto and any cancellation thereof.  Each of the Members shall, upon request from a Manager, promptly execute, acknowledge and deliver any instruments reasonably required to reflect the foregoing.

15.2.    Conclusive Evidence.  In no event shall any Person dealing with the Manager or Authorized Persons or their representatives with respect to any property of the Company be obligated to ascertain that the terms of this Agreement have been complied with, or be obligated to inquire into the necessity or expediency of any act or action of the Manager or its representatives (including any Authorized Person), and every contract, agreement, deed, mortgage, promissory note, or other instrument or document executed by the Manager with respect to any property of the Company shall be conclusive evidence in favor of any and every Person relying thereon or claiming thereunder that (i) at the time of the execution and/or delivery thereof, this Agreement was in full force and effect; (ii) such instrument or document was duly executed in accordance with the terms and provisions of this Agreement and is binding upon the Company and all of the Members hereof; and (iii) the Manager executing same or its representative was duly authorized and empowered to execute and deliver any and every such instrument or document for and on behalf of the Company.

Section 16. Miscellaneous.

16.1.    Notices.  (a)  All notices, requests, approvals, authorizations, consents and other communications required or permitted under this Agreement shall be in writing (whether or not expressly stated as to be in writing hereunder) and shall be (as elected by the Person giving such notice) hand delivered by messenger or overnight courier service, mailed (airmail, if international) by registered or certified mail (postage prepaid), return receipt requested, or sent via facsimile or email (provided such facsimile or email is immediately followed by the delivery of an original copy of same via one of the other foregoing delivery methods) addressed to:

If to DYNAMIC:

10 West Street, Apartment 40B,
New York, NY, 10004
Attn: Gary Segal
E-mail: gsegal@dynamicstarllc.com


With a copy to:

Goldberg Weprin Finkel Goldstein LLP
1501 Broadway, 22nd Floor
New York, NY 10036
Attn: Andrew W. Albstein, Esq.
E-mail: aalbstein@gwfglaw.com

If to Namdar:

NAMDAR FORDHAM LANDING LLC
150 Great Neck Road, Suite 304
Great Neck, New York 11021
Attn:  Igal Namdar
Email:  igal@namdarllc.com
With a copy to:

The Law Office of Alan Merovitch
3 Elm Avenue
Somers, NY 10589
Attn: Alan Merovitch, Esq.
Email: amerovitch@hotmail.com


If to Plymouth:

_____
_____


(b)  Each such notice shall be deemed delivered (i) on the date delivered if by hand delivery or overnight courier service or facsimile, or email (with confirmation of receipt by the recipient), and (ii) on the date upon which the return receipt is signed or delivery is

refused or the notice is designated by the postal authorities as not deliverable, as the case may be, if mailed (provided, however, if such actual delivery occurs after 5:00 p.m. (local time where received), then such notice or demand shall be deemed delivered on the immediately following Business Day after the actual day of delivery).

(c)    By giving to the other parties at least fifteen (15) days prior written notice thereof, the parties hereto and their respective successors and assigns shall have the right from time to time and at any time during the term of this Agreement to change their respective addresses.

16.2.    <u>Governing Law</u>.    (a) This Agreement and the rights of the Members hereunder shall be governed by, and interpreted in accordance with, the laws of the State of New York.

(b)    Each of the parties hereto irrevocably submits to the jurisdiction of the New York State courts and the U.S. Federal courts sitting in the Southern District of New York and agrees that all matters involving this Agreement shall be heard and determined in such courts. Each of the parties hereto waives irrevocably the defense of inconvenient forum to the maintenance of such action or proceeding.  Each of the parties designates the Secretary of State of the State of New York, as its agent for service of process in the State of New York, which designation may only be changed on not less than ten (10) days' prior notice to all of the other parties.

16.3.    <u>Successors</u>.  This Agreement shall be binding upon, and inure to the benefit of, the parties and their successors and permitted assigns.  Except as otherwise provided herein, any Member who Transfers its Interest as permitted by the terms of this Agreement shall have no further liability or obligation hereunder, except with respect to claims arising prior to such Transfer.

16.4.    <u>Pronouns</u>.  Whenever from the context it appears appropriate, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in either the masculine, the feminine or the neuter gender shall include the masculine, feminine and neuter.

16.5.    <u>Table of Contents and Captions Not Part of Agreement</u>.  The table of contents and captions contained in this Agreement are inserted only as a matter of convenience and in no way define, limit or extend the scope or intent of this Agreement or any provisions hereof.

16.6.    <u>Severability</u>.  If any provision of this Agreement shall be held invalid, illegal or unenforceable in any jurisdiction or in any respect, then the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired, and the Members shall use their best efforts to amend or substitute such invalid, illegal or unenforceable provision with enforceable and valid provisions which would produce as nearly as possible the rights and obligations previously intended by the Members without renegotiation of any material terms and conditions stipulated herein.

16.7.    Counterparts.  This Agreement may be executed in several counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.

16.8.    Entire Agreement and Amendment.  This Agreement and the other written agreements described herein between the parties hereto entered into as of the date hereof, constitute the entire agreement between the Members relating to the subject matter hereof and fully supersedes any and all prior agreements or understandings between the parties hereto pertaining to the subject matter hereof.  No amendment or waiver of this Agreement (or provision hereof) shall be enforceable against any Member unless it is in writing and duly executed by such Member.

16.9.    Further Assurances.  Each Member agrees to execute and deliver any and all additional instruments and documents and do any and all acts and things as may be necessary or expedient to effectuate more fully this Agreement or any provisions hereof or to carry on the business contemplated hereunder.

16.10.   No Third Party Rights.  The provisions of this Agreement are for the exclusive benefit of the Members and the Company, and no other party (including, without limitation, any creditor of the Company) shall have any right or claim against any Member by reason of those provisions or be entitled to enforce any of those provisions against any Member.

16.11.   Incorporation by Reference.  Every Exhibit, Schedule, and Annex attached to this Agreement is incorporated in this Agreement by reference.  Unless otherwise expressly provided herein, all references to "Articles", "Sections", "subsections" or "paragraphs" are to Articles, Sections, subsections and paragraphs of this Agreement and all references to "Exhibits", "Annexes" and "Schedules" are to the exhibits, annexes and schedules attached hereto.

16.12.   Limitation on Liability.  The Members shall not be bound by, or be personally liable for, by reason of being a Member, a judgment, decree or order of a court or in any other manner, for the expenses, liabilities or obligations of the Company, and the liability of each Member in respect thereof shall be limited solely to the amount of its Capital Contributions as provided under Section 5.  Any claim against any Member (the "**Member in Question**") which may arise under this Agreement shall be made only against, and shall be limited to, the Interest of such Member in Question, the proceeds of the sale by the Member in Question of such Interest or the undivided interest in the assets of the Company distributed to the Member in Question pursuant to Section 13.3(d) hereof.  Any right to proceed against (i) any other assets of the Member in Question or (ii) any agent, officer, director, member, manager, partner, shareholder or employee of the Member in Question or the assets of any such Person, as a result of such a claim against the Member in Question arising under this Agreement or otherwise, is hereby irrevocably and unconditionally waived.

16.13.   Remedies Cumulative; Dispute Costs.  The rights and remedies given in this Agreement and by law to a Member shall be deemed cumulative, and the exercise of one of such remedies shall not operate to bar the exercise of any other rights and remedies reserved to a Member under the provisions of this Agreement or given to a Member by law.  In the event of any dispute between the parties hereto, the prevailing party shall be entitled to recover from the other party reasonable attorney's fees and costs incurred in connection therewith.

16.14.  <u>No Waiver</u>.  One or more waivers of the breach of any provision of this Agreement by any Member shall not be construed as a waiver of a subsequent breach of the same or any other provision, nor shall any delay or omission by a Member to seek a remedy for any breach of this Agreement or to exercise the rights accruing to a Member by reason of such breach be deemed a waiver by a Member of its remedies and rights with respect to such breach.

16.15.  <u>Limitation On Use of Names</u>.  Notwithstanding anything contained in this Agreement or otherwise to the contrary, each Members as to itself agrees that neither it nor any of its Affiliates, agents, or representatives is granted a license to use or shall use the name of the other under any circumstances whatsoever unless approved in writing by the Member whose name is to be used.

16.16.  <u>Certificates or Affidavits</u>.  At any time or times, upon the request of the Manager, the Members shall execute, acknowledge and swear to any certificates or affidavits or certificates of fictitious firm name, trade name or the like (and any amendments or cancellations thereof) required by the law of New York or any other jurisdiction in which the Company does or proposes to do business.  In addition, upon the request of the Manager, each Member shall provide such disclosures as to such Member as may be required by the Attorney General.

16.17.  <u>Publicly Traded Partnership Provision</u>.  Each Member hereby severally covenants and agrees with the other Members for the benefit of such Members, that (i) it is not currently making a market in Interests in the Company and will not in the future make such a market and (ii) it will not Transfer its Interest on an established securities market, a secondary market or an over-the-counter market or the substantial equivalent thereof within the meaning of Code Section 7704 and the Regulations, rulings and other pronouncements of the U.S. Internal Revenue Service or the Department of the Treasury thereunder.  Each Member further agrees that it will not Transfer any Interest in the Company to any transferee unless such transferee agrees to be bound by this Section and to Transfer such Interest only to such Persons who agree to be similarly bound.

16.18.  <u>Status as Accredited Investors</u>.  Each Member represents and warrants to the Company that it is an "**<u>accredited investor</u>**" as that term is defined in Rule 501 of Regulation D promulgated under the U.S. Securities Act of 1933, as amended (the "**<u>Securities Act</u>**"), and as set forth on <u>Schedule I</u>, attached hereto.  Further each Member represents that it has received and reviewed the Investment Memorandum, annexed as <u>Exhibit F</u> hereto, and any other information regarding the Company that such Member has requested and that such Member has been afforded the opportunity to ask questions and receive answers regarding the Company's business and operations and the terms of this Agreement to its complete satisfaction.

16.19.  <u>Uniform Commercial Code</u>.  The interest of each Member in the Company shall be an "uncertificated security" governed by Article 8 of the UCC as enacted in the State of New York (the "**<u>New York UCC</u>**"), including, without limitation, (i) for purposes of the definition of a "security" thereunder, the interest of each Member in the Company shall be a security governed by Article 8 of the New York UCC and (ii) for purposes of the definition of an "uncertificated security" thereunder.

16.20.  <u>Public Announcements</u>.  No Member, without the prior written approval of the Manager, shall issue any press releases or otherwise make any public statements with respect to the Company, any Subsidiary, the Properties or the transactions contemplated by this Agreement.

16.21.  <u>No Construction Against Drafter</u>.  This Agreement has been negotiated and prepared by each Member and their respective attorneys and, should any provision of this Agreement require judicial interpretation, the court interpreting or construing such provision shall not apply the rule of construction that a document is to be construed more strictly against one party.

<u>Section 17.    Special Purpose Entity Requirements</u>

17.1    <u>Supremacy of this Section</u>.  This <u>Section 17</u> has been adopted in order to comply with certain provisions of the Prefco LLCA that require the Company to qualify as a so-called "Special Purpose Entity".  This Article is written for the express benefit of the Preferred Investor and shall supersede any inconsistent provision of this Agreement.

17.2    <u>Limitation of Purpose</u>. The purpose of the Company is as set forth in <u>Section 3</u> and the Company shall not engage in any other business or activity and shall not own any assets or incur any obligations other than in furtherance of such limited purpose.

17.3    <u>Separateness/Operations Matters</u>. Until such time as no Obligations remain outstanding, the Company will remain a "Special Purpose Entity," which means a limited liability company that, since the date of its formation and at all times on and after the date thereof, has complied with and shall at all times comply with the following requirements unless it has received prior consent to do otherwise from Preferred Investor:

(i)    is and shall be organized solely for the purpose of acting as a member of Prefco and transacting lawful business that is incident, necessary and appropriate to accomplish the foregoing;

(ii)    has not engaged and shall not engage in any business unrelated to acting as the sole member of Prefco;

(iii)    has not owned and shall not own any real property other than the Properties;

(iv)    does not have, shall not have and at no time had any assets other than its membership interest in Prefco, and personal property necessary or incidental to its ownership of such interest;

(v)    shall not cause, consent to, or permit any amendment of its certificate of formation or its limited liability company agreement with respect to the matters set forth in this definition;

(vi)    is and shall be a Delaware limited liability company;

(vii)    has and shall have a limited liability agreement that provides that such entity shall not (A) dissolve, merge, liquidate, consolidate; (B) sell all or substantially all of its assets, except as expressly permitted under the Investment Documents; or (C) amend its organizational documents with respect to the matters set forth in this definition without the consent of Preferred Investor;

(viii)    has at all times been and shall intend at all times to remain solvent and has paid and shall pay its debts and liabilities (including, a fairly-allocated portion of any personnel and overhead expenses that it shares with any Affiliate) from its assets as the same shall become due, and has maintained and shall intend to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations; provided, that the foregoing shall not require any direct or indirect member of Prefco or the Company to make any additional capital contributions to Prefco or the Company, as the case may be;

(ix)    has not failed and shall not fail to correct any known misunderstanding regarding the separate identity of such entity and has not identified and shall not identify itself as a division of any other Person;

(x)    has maintained and shall maintain its bank accounts, books of account, books and records separate from those of any other Person and, to the extent that it is required to file tax returns under applicable law, has filed and shall file its own tax returns, except to the extent that it is required by law to file consolidated tax returns;

(xi)    has maintained and shall maintain its own records, books, resolutions and agreements;

(xii)    has not commingled and, except as contemplated by this Agreement, shall not commingle its funds or assets with those of any other Person and has not participated and shall not participate in any cash management system with any other Person;

(xiii)    has held and shall hold its assets in its own name;

(xiv)    has conducted and shall conduct its business in its name or in a name franchised or licensed to it by an entity other than an Affiliate of itself;

(xv)    (A) has maintained and shall maintain its financial statements, accounting records and other entity documents separate from those of any other Person; (B) has shown and shall show, in its financial statements, its assets and liabilities separate and apart from those of any other Person; and (C) has not permitted and shall not permit its assets to be listed as assets on the financial statement of any of its Affiliates except as required by GAAP; provided, however, that any such consolidated financial statement contains a note indicating that the Special Purpose Entity's separate assets and credit are not available to pay the debts of such Affiliate and that the Special Purpose Entity's liabilities do not constitute obligations of the consolidated entity;

(xvi)    has paid and shall pay its own liabilities and expenses, including the salaries of its own employees, out of its own funds and assets, and has maintained and shall maintain a sufficient number of employees or contract for sufficient services in light of its contemplated business operations;

(xvii)    has observed and shall observe all limited liability company formalities;

(xviii)    does not have and shall not incur any Indebtedness other than Permitted Indebtedness;

(xix)    has not assumed, guaranteed, or become obligated and shall not assume or guarantee or become obligated for the debts of any other Person, has not held out and shall not hold out its credit as being available to satisfy the obligations of any other Person or has not pledged and shall not pledge its assets to secure the obligations of any other Person, in each case except as permitted or contemplated by the Investment Documents;

(xx)    has not acquired and shall not acquire obligations or securities of its members or any Affiliate;

(xxi)    has allocated and shall allocate fairly and reasonably any overhead expenses that are shared with any of its Affiliates, constituents, or owners, or any guarantors of any of their respective obligations, or any Affiliate of any of the foregoing, including, but not limited to, paying for shared office space and for services performed by any employee of an Affiliate;

(xxii)    has maintained and used and shall maintain and use separate stationery, invoices and checks bearing its name and not bearing the name of any other entity unless such entity is clearly designated as being the Special Purpose Entity's agent;

(xxiii)    has not pledged and shall not pledge its assets to secure the obligations of any other Person, except to Preferred Investor to secure the Obligations;

(xxiv)    has held itself out and identified itself and shall hold itself out and identify itself as a separate and distinct entity under its own name or in a name franchised or licensed to it by an entity other than an Affiliate of Prefco and not as a division or part of any other Person;

(xxv)    has maintained and shall maintain its assets in such a manner that it shall not be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

(xxvi)    has not made and shall not make loans to any Person and has not held and shall not hold evidence of indebtedness issued by any other Person or entity (other than cash and Permitted Investments);

(xxvii)  has not identified and shall not identify its members or any Affiliate of any of them, as a division or part of it, and has not identified itself and shall not identify itself as a division of any other Person;

(xxviii) other than capital contributions and distributions permitted under the terms of its organizational documents, has not entered into or been a party to, and shall not enter into or be a party to, any transaction with any of its members except in the ordinary course of its business and on terms which are commercially reasonable terms comparable to those of an arm's-length transaction with an unrelated third party;

(xxix)  does not have and shall not have any obligation to, and does not currently indemnify and shall not indemnify its partners, officers, directors, or members, as the case may be, in each case unless such an obligation or indemnification is fully subordinated to the Debt and shall not constitute a claim against it in the event that its cash flow is insufficient to pay the Debt;

(xxx)   has not had and shall not have any of its obligations guaranteed by any Affiliate, except as provided by the Investment Documents or as otherwise consented to by Preferred Investor;

(xxxi)  has not formed, acquired, or held and shall not form, acquire, or hold any subsidiary, except as contemplated by the Investment Documents;

(xxxii) has complied and shall comply with all of the terms and provisions contained in its organizational documents; and

(xxxiii) has not permitted and shall not permit any Affiliate or constituent party independent access to its bank accounts.

[*SIGNATURES ON NEXT PAGE*]

IN WITNESS WHEREOF, this Agreement is executed by the Members, effective as of the date first set forth above.

**DYNAMIC STAR III LLC**

By: _____

    Name: _____

    Title: _____

**THE PLYMOUTH GROUP III LLC**

By: _____

    Name: _____

    Title: _____

**DS 3 GP INC.**

By: _____

Name: _____

Title: _____

**NAMDAR**:

NAMDAR FORDHAM LANDING LLC,
a New York limited liability company

BY:    NAMCO REALTY LLC,
        a New York limited liability company,
        its sole member

        BY:    NAMCO REALTY LTD.,
            a British Virgin Island
            company, its sole member

            By: _____

                Name: Igal Namdar

                By:    CEO

IN WITNESS WHEREOF, this Agreement is executed by the Members, effective as of the date first set forth above.

DYNAMIC STAR III LLC

By: _____

    Name:

    Title:


THE PLYMOUTH GROUP III LLC

By: _____

    Name: MICHAEL DAVIS

    Title: Authorized Person

DS 3 GP INC.

By: _____

Name:

Title:


**NAMDAR**:

NAMDAR FORDHAM LANDING LLC,
a New York limited liability company

BY:    NAMCO REALTY LLC,
        a New York limited liability company,
        its sole member

        BY:    NAMCO REALTY LTD.,
                a British Virgin Island
                company, its sole member

                By: _____

                    Name: Igal Namdar

                    By:    CEO

IN WITNESS WHEREOF, this Agreement is executed by the Members, effective as of the date first set forth above.

**DYNAMIC STAR III LLC**

By: _____

      Name:

      Title:

**THE PLYMOUTH GROUP III LLC**

By: _____

      Name:

      Title:

**DS 3 GP INC.**

By: _____

Name:

Title:

**NAMDAR:**

NAMDAR FORDHAM LANDING LLC,
a New York limited liability company

BY:    NAMCO REALTY LLC,
        a New York limited liability company,
        its sole member

        BY:    NAMCO REALTY LTD.,
                a British Virgin Island
                company, its sole member

            By: _____

                Name: Igal Namdar

                By:    CEO

## EXHIBIT A
### Capital Contributions

| MEMBER: | INITIAL CAPITAL CONTRIBUTION | PERCENTAGE INTEREST | DISTRIBUTION PERCENTAGES PURSUANT TO SECTION 6.1(b) |
|---|---|---|---|
| DS GP 3 Inc.<br>10 West Street, Apartment 40B,<br>New York, NY, 10004 | $_____ | 0.5% | 0.5% |
| Dynamic Star III LLC<br>10 West Street, Apartment 40B,<br>New York, NY, 10004 | $_____ | 32.46% | 49.6% |
| The Plymouth Group III, LLC<br>c/o Meister Seelig & Fein LLP<br>125 Park Ave. 17th Floor<br>New York, NY 10071 | $_____ | 9.9% | 9.9% |
| Namdar Fordham Landing LLC<br>150 Great Neck Road, Suite 304<br>Great Neck, New York, 11021 | $_____ | 57.14% | 40% |
| **TOTAL** | $_____ __ | **100.00%** | |

### Initial Management Committee Representatives

| Representative | Name |
|---|---|
| Namdar Representative | Igal Namdar |
| Dynamic Representative | Gary Segal |

## EXHIBIT B
### Definitions

For the purposes of this Agreement, the following terms shall have meanings set forth below.

"**Act**" shall mean the Delaware Limited Liability Company Act, as amended from time to time.

"**Advisor**" shall mean any accountant, attorney or other advisor retained by a Member.

"**Affiliate**" shall mean as to any Person any other Person that directly or indirectly controls, is controlled by, or is under common control with such first Person.  For the purposes of this Agreement, a Person shall be deemed to control another Person if such Person possesses, directly or indirectly, the power to direct or cause the direction of the management, policies and/or decision making of such other Person, whether through the ownership of voting securities, by contract or otherwise.  In addition, "**Affiliate**" shall include as to any Person, any other Person related to such Person within the meaning of Code Sections 267(b) or 707(b)(1).  For purposes of this Agreement, the Company and the Subsidiaries shall not be deemed Affiliates of Dynamic, Namdar or any of their respective Affiliates.  Without limiting the foregoing, (i) Manager, the Dynamic Key Individuals and each Person that is an Affiliate of any of such Persons shall each be deemed to be an Affiliate of the other, and (ii) Namdar, the Namdar Key Individual and each Person that is an Affiliate of any of such Persons shall each be deemed to be an Affiliate of the other.

"**Agreed Upon Value**" shall mean the fair market value (net of any liability secured by such property that the Company assumes or takes subject to) agreed upon pursuant to a written agreement between the Members of property contributed by a Member to the capital of the Company, which shall for all purposes hereunder be deemed to be the amount of the Capital Contribution applicable to such property contributed.

"**Agreement**" shall mean this Second Amended and Restated Limited Liability Company Agreement, as amended from time to time.

"**Annual Business Plan**" shall have the meaning provided in Section 9.3.

"**Assignees**" shall have the meaning provided in Section 12.5(b).

"**Bankruptcy Code**" shall mean Title 11 of the United States Code, as amended or any other applicable bankruptcy or insolvency statute or similar law.

"**Bankruptcy/Dissolution Event**" shall mean, with respect to the affected party, (i) the entry of an Order for Relief under the Bankruptcy Code, (ii) the admission by such party of its inability to pay its debts generally as they mature, (iii) the making by it of an assignment for the benefit of creditors generally, (iv) the filing by it of a petition in bankruptcy or a petition for relief under the Bankruptcy Code or any other applicable Federal or state bankruptcy or insolvency statute or any similar law, (v) the expiration of ninety (90) days after the filing of an involuntary

petition under the Bankruptcy Code without such petition being vacated, set aside or stayed during such period, (vi) an application by such party for the appointment of a receiver for the assets of such party, (vii) an involuntary petition seeking liquidation, reorganization, arrangement or readjustment of its debts under any other Federal or state insolvency law, provided that the same shall not have been vacated, set aside or stayed within ninety (90) days after filing, (viii) the imposition of a judicial or statutory lien on all or a substantial part of its assets unless such lien is discharged or vacated or the enforcement thereof stayed within ninety (90) days after its effective date, (ix) an inability to meet its financial obligations generally as they accrue, or (x) a dissolution or liquidation.

"**BB Act**" shall have the meaning provided in Section 8.3.

"**Beneficial Owner**" shall have the meaning provided in Sections 5.7 and 12.4(b).

"**Business Day**" shall mean any day that is not Saturday, Sunday or a day on which banks are required or permitted to be closed in the State of New York.

"**Capital Account**" shall have the meaning provided in Section 5.6.

"**Capital Contribution**" shall mean, with respect to any Member, the aggregate amount of (i) cash, and (ii) the Agreed Upon Value of other property contributed (or as the context requires, to be contributed) by such Member to the capital of the Company.

"**Capital Conversion**" shall have the meaning provided in Section 5.2(c).

"**Cash Flow**" shall mean, for any period for which Cash Flow is being calculated, gross cash receipts of the Company (but excluding Capital Contributions) plus any amounts released from reserves and not applied to the relevant obligation or liability for which such reserves were established or to other costs and expenses of the Company, less the following payments and expenditures (i) all payments of operating expenses of the Company, (ii) all payments of principal of, interest on and any other amounts due with respect to indebtedness, leases or other commitments or obligations of the Company, (iii) all sums expended by the Company for capital expenditures, (iv) all prepaid expenses of the Company, (v) all sums expended by the Company which are otherwise capitalized, (vi) payment of Unincorporated Business Tax (if applicable), and (vii) reserves for anticipated capital expenditures, future working capital needs and operating expenses, contingent obligations and other purposes.

"**Certificate of Formation**" shall mean the articles of organization filed with the Department of State of the State of Delaware on July 8, 2022, as amended, for the purpose of forming the Company.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended from time to time, including the corresponding provisions of any successor law.

"**Collateral Agreement**" shall mean any agreement, instrument, document or covenant concurrently or hereafter made or entered into under, pursuant to, or in connection with this Agreement and any certifications made in connection therewith or amendment or amendments made at any time or times heretofore or hereafter to any of the same (including, without limitation,

the Development Agreement).

"**Company**" shall mean the limited liability company created hereunder and pursuant to the filing of the Articles of Organization in the office of the Secretary of State of New York.

"**Company Assets**" shall mean all right, title and interest of the Company in and to all or any portion of the assets of the Company and any property of any type (whether real, personal, tangible or intangible), or estate or interest acquired in exchange therefor or in connection therewith, including, without limitation, the Company's interest in any Subsidiary.

"**Confidential Information**" shall have the meaning provided in Section 10(a).

"**Converted Amount**" shall have the meaning provided in Section 5.2(b).

"**Certification**" shall mean that certain certification of the Rezoning by the New York City Department of City Planning, prior to the Uniform Land Use Review Procedure ("ULURP"), pursuant to New York City zoning guidelines.

"**Company Representative**" shall have the meaning provided in Section 8.3.

"**Contributing Member**" shall have the meaning provided in Section 5.2(b).

"**Control**", "**controlled**", "**controls**" or "**controlling**" shall mean in the case of any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting equity interests, by contract, or otherwise.

"**Credit Provider**" shall have the meaning provided in Section 9.9(b).

"**Cure Period**" means (i) ten (10) business days after written notice specifying the nature of a default or breach under this Agreement or any Collateral Agreement in connection with a monetary default that is not a "**Noncurable Default**" (as hereinafter defined); (ii) thirty (30) days after written notice specifying the nature of a default or breach under this Agreement or any Collateral Agreement, in connection with a non-monetary default that is not a Noncurable Default (provided, however, that if such non-monetary default is not a Noncurable Default and cannot reasonably be cured within such 30-day period, and the defaulting party promptly commences the cure of such default and diligently pursues such cure to completion, then such 30-day period shall be extended to the extent reasonably necessary); and (iii) no period at all for a Noncurable Default. A "**Noncurable Default**" means a default or breach that is not capable of being cured and, without limitation, includes any of the following:  (a) a knowing and intentional breach, (b) a breach of any restriction on assignment, hypothecation or other transfer (including, without limitation, Section 12 or Section 9.8), or (c) a breach constituting fraud, bad faith or willful misconduct.

"**Damages**" shall have the meaning provided in Section 14.2.

"**Development Agreement**" shall have the meaning provided in Section 9.4(c)(2).

"**Development Fee**" shall have the meaning provided in Section 9.4(c)(2).

"**Default Amount**" shall have the meaning provided in Section 5.2(b).

"**Default Loan**" shall have the meaning provided in Section 5.2(b)(1).

"**Default Loan Rate**" shall mean the per annum rate equal to the lower of (i) eighteen percent (18%) and (ii) the highest rate permitted by applicable laws.

"**Dissolution Event**" shall have the meaning provided in Section 13.2.

"**Distributable Funds**" shall mean, with respect to any quarter or other period, as applicable, an amount equal to the Cash Flow of the Company for such quarter or other period, as applicable, as reduced by reserves for anticipated capital expenditures, future working capital needs and operating expenses, contingent obligations, and other purposes, the amounts of which shall be reasonably determined from time to time by Manager.

"**Distributions**" shall mean the distributions payable (or deemed payable) to a Member (including, without limitation, its allocable portion of Distributable Funds).

"**Dynamic**" shall mean Dynamic Star III LLC, a Delaware limited liability company.

"**Dynamic Change of Control**" shall mean, if at any time, other than as a result of the death or Disability of the Dynamic Key Individuals, Dynamic ceases to be directly or indirectly (i) wholly-controlled by one or more of the Dynamic Key Individuals and (ii) owned (legally, beneficially and economically) at least seventy-five percent (75%) by one or more of the Dynamic Key Individuals.

"**Dynamic Indirect Permitted Transferee**" shall mean (i) any Family Member of any Dynamic Key Individual, (ii) any trust created solely for the benefit of any Dynamic Key Individual and any Family Member of a Dynamic Key Individual which is wholly-controlled by the Dynamic Key Individual, or (iii) any partnership, limited liability company or corporation that at all times is and remains wholly-owned and wholly-controlled, directly or indirectly, by one or more of the Dynamic Key Individuals.

"**Dynamic Key Individuals**" shall mean Gary Segal.

"**Dynamic Permitted Transferee**" shall mean any Person that is directly or indirectly (i) wholly-controlled by one or more of the Dynamic Key Individuals, (ii) wholly-owned (legally, beneficially and economically) by one or more of the Dynamic Key Individuals alone or together with one or more Dynamic Indirect Permitted Transferees, and (iii) owned (legally, beneficially and economically) at least seventy-five percent (75%) by one or more of the Dynamic Key Individuals.

"**Dynamic Representatives**" shall have the meaning provided in Section 9.2(a).

"**Economic Interest**" means a Person's share of the profits and losses of, and the

right to receive Distributions from, the Company pursuant to this Agreement and the Act, but shall not include any right to vote on, consent to or otherwise participate in any decision of the Members.

"**Economic Interest Holder**" means any Person who holds an Economic Interest, whether as a Member or an un-admitted assignee of a Member.

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time.

"**Family Member**" shall mean, with respect to any individual, any spouse or lineal descendant or spouse of a lineal descendant, whether by adoption or marriage, of such individual.

"**Fiscal Year**" shall mean each calendar year ending December 31.

"**Flow-Through Entity**" shall have the meaning provided in Sections 5.7 and 12.4(b).

"**Foreign Corrupt Practices Act**" shall mean the Foreign Corrupt Practices Act of the United States, 15 U.S.C. Sections 78a, 78m, 78dd-1, 78dd-2, 78dd-3, and 78ff, as amended, if applicable, or any similar law of any jurisdiction where one or more properties owned or leased by the Company or a Subsidiary are located or where the Company or any of the Subsidiaries transacts business or any other jurisdiction, if applicable.

"**Income**" shall mean the gross income of the Company for any month, Fiscal Year or other period, as applicable, calculated in accordance with Federal income tax accounting principles, including gains realized on the sale, exchange or other disposition of the Company's assets; provided, however, that if any property is carried on the books of the Company at a value that differs from that property's adjusted basis for tax purposes, gain with respect to such property shall be computed with reference to the book basis of such property, consistently with the requirement of Treasury Regulations §1.704-1(b)(2)(iv)(g); and provided further, that any item allocated under Section 7.2 shall be excluded from the computation of Income.

"**Indemnified Party**" shall have the meaning provided in Section 14.3(a).

"**Indemnifying Party**" shall have the meaning provided in Section 14.3(a)

"**Initial Capital Contributions**" shall have the meaning provided in Section 5.1(a).

"**Interest**" shall mean, with respect to each Member, the entire limited liability company interest of such Member in the Company, which includes, without limitation, any and all rights, powers and benefits accorded a Member under this Agreement and the duties and obligations of such Member hereunder.

"**Investment Maintenance Costs**" shall mean the actual third-party out-of-pocket costs incurred by Manager on behalf of or otherwise relating to or intended to benefit the Company, such as reasonable travel, appraisal, legal, accounting, diligence and investigation expenses.

"**Land**" shall mean the land that is the site of the Properties.

"**Lockout Period**" shall mean the later of (A) the period of time beginning on the date of this Agreement and ending either (i) if the Certification is obtained within twenty four (24) months from the effective date of this Agreement, then eight (8) months after the Certification, and (ii) if the Certification is not obtained within twenty four (24) months from the date of this Agreement, the date that is twenty-four (24) months after the date of this Agreement; or (B) such time as any applicable construction financing can be prepaid by the Company without penalty.

"**Loss**" shall mean the aggregate of losses, deductions and expenses of the Company for any month, Fiscal Year or other period, as applicable, calculated in accordance with Federal income tax accounting principles, including losses realized on the sale, exchange or other disposition of the Company's assets; provided, however, that if any property is carried on the books of the Company at a value that differs from that property's adjusted basis for tax purposes, loss, depreciation and amortization with respect to such property shall be computed with reference to the book basis of such property, consistently with the requirement of Treas.   Reg. §1.704-1(b)(2)(iv)(g); and provided further, that any item allocated under Section 7.2 shall be excluded from the computation of Loss.

"**Major Decisions**" shall mean those decisions listed on Exhibit C.

"**Management Committee**" shall have the meaning provided in Section 9.2(a).

"**Manager**" shall have the meaning provided in Section 9.1.

"**Member**" and "**Members**" shall mean Dynamic, Namdar and any other Person admitted to the Company pursuant to this Agreement.  For purposes of the Act, the Members shall constitute a single class or group of members.

"**Member in Question**" shall have the meaning provided in Section 16.12.

"**Namdar**" shall mean Namdar Fordham Landing LLC, a New York limited liability company.

"**Namdar Change of Control**" shall mean, if at any time, other than as a result of the death or Disability of the Namdar Key Individuals, Namdar ceases to be directly or indirectly (i) wholly-controlled by one or more of the Namdar Key Individuals and (ii) owned (legally, beneficially and economically) at least fifty percent (50%) by one or more of the Namdar Key Individuals.

"**Namdar Indirect Permitted Transferee**" shall mean (i) any Family Member of any Namdar Key Individual, (ii) any trust created solely for the benefit of any Namdar Key Individual and any Family Member of a Namdar Key Individual which is wholly-controlled by the Namdar Key Individual, or (iii) any partnership, limited liability company or corporation that at all times is and remains wholly-owned and wholly-controlled, directly or indirectly, by one or more of the Namdar Key Individuals.

"**Namdar Key Individuals**" shall mean Igal Namdar.

"**Namdar Permitted Transferee**" shall mean any Person that is directly or

indirectly (i) wholly-controlled by one or more of the Namdar Key Individuals, (ii) wholly-owned (legally, beneficially and economically) by one or more of the Namdar Key Individuals alone or together with one or more Namdar Indirect Permitted Transferees, and (iii) owned (legally, beneficially and economically) at least fifty percent (50%) by one or more of the Namdar Key Individuals.

"**Namdar Representatives**" shall have the meaning provided in Section 9.2(a).

"**Net Income**" shall mean the amount, if any, by which Income for any period exceeds Loss for such period.

"**Net Loss**" shall mean the amount, if any, by which Loss for any period exceeds Income for such period.

"**Non-Credit Provider**" shall have the meaning set forth in Section 9.9(b).

"**Non-Funding Member**" shall have the meaning provided in Section 5.2(b).

"**Obligations**" shall mean any and all rights under and amounts due and owing to Preferred Investor pursuant to the Prefco LLCA or other Investment Documents (as defined in the Prefco LLCA) or in respect of the Preferred Investment (including and additional advances or sums accrued thereon), together with all obligations of Member and its affiliates to Preferred Investor under the Prefco LLCA and any other Investment Documents (as defined in the Prefco LLCA).

"**OFAC**" shall have the meaning provided in Section 9.9(c).

"**Organizational Expenses**" shall have the meaning provided in Section 4(b).

"**Other MC Decision**" shall mean each decision required to be made by the Management Committee pursuant to the express terms of this Agreement, other than the Major Decisions.

"**Percentage Interest**" shall have the meaning provided in Section 5.3.

"**Person**" shall mean any individual, corporation, partnership, joint venture, association, joint-stock company, limited liability company, trust, unincorporated organization, government or any agency or political subdivision thereof or any other legal entity.

"**Plymouth**" shall mean Plymouth Group III LLC, a New York limited liability company.

"**Plymouth BCP Distribution**" shall have the meaning set forth in Section 6.4.

"**Plymouth Change of Control**" shall mean, if at any time, other than as a result of the death or Disability of the Plymouth Key Individuals, Plymouth ceases to be directly or indirectly (i) wholly-controlled by one or more of the Plymouth Key Individuals and (ii) owned (legally, beneficially and economically) at least seventy-five percent (75%) by one or more of the

Plymouth Key Individuals.

"**Plymouth Indirect Permitted Transferee**" shall mean (i) any Family Member of any Plymouth Key Individual, (ii) any trust created solely for the benefit of any Plymouth Key Individual and any Family Member of a Plymouth Key Individual which is wholly-controlled by the Plymouth Key Individual, or (iii) any partnership, limited liability company or corporation that at all times is and remains wholly-owned and wholly-controlled, directly or indirectly, by one or more of the Plymouth Key Individuals.

"**Plymouth Key Individuals**" shall mean Michael Davis and Joshua Goldstein.

"**Plymouth Permitted Transferee**" shall mean any Person that is directly or indirectly (i) wholly-controlled by one or more of the Plymouth Key Individuals, (ii) wholly-owned (legally, beneficially and economically) by one or more of the Plymouth Key Individuals alone or together with one or more Plymouth Indirect Permitted Transferees, and (iii) owned (legally, beneficially and economically) at least seventy-five percent (75%) by one or more of the Plymouth Key Individuals.

"**Prefco**" shall have the meaning set forth in the Recitals hereto.

"**Prefco LLCA**" shall mean that certain Limited Liability Operating Agreement of Prefco, to which Preferred Investor is a member and has made its Preferred Investment.

"**Preferred Investor**" shall have the meaning set forth in the Recitals hereto, together with its respective successors and permitted assigns.

"**Preferred Investment**" shall have the meaning ascribed to such term in the Prefco LLCA.

"**Project**" shall mean the construction and development of mixed use commercial and residential buildings on the Land.

"**Properties**" shall have the meaning set forth in the Recitals.

"**Regulations**" shall mean the Treasury Regulations promulgated pursuant to the Code, as amended from time to time, including the corresponding provisions of any successor regulations.

"**Representatives**" shall have the meaning provided in Section 9.2(a).

"**Rezoning**" means the reclassification of the Land, at the conclusion of ULURP for zoning purposes currently being pursued by the Company, after which the Land will be zoned to permit not less than 1,800,000 square feet of residential use and 600,000 square feet of commercial use.

"**Securities Act**" shall mean the Securities Act of 1933, as amended.

"**Subsidiary**" shall mean any corporation, partnership, limited liability company or

other entity of which ten percent (10%) or more of the equity interest is owned directly or indirectly by the Company, including without limitation, the Borrowers and PrefCo.

"**Tax Proceedings**" shall have the meaning provided in Section 8.3.

"**Third Party Lender**" means any other source of third-party acquisition and/or construction financing or refinancing for the Properties and/or the business of the Company and its direct or indirect subsidiaries.

"**Total Investment**" shall mean, with respect to each Member the sum of the aggregate Capital Contributions made (or deemed made) by such Member.

"**Transfer**" means, as a noun, any transfer, sale, assignment, exchange, charge, pledge, gift, hypothecation, conveyance, encumbrance or other disposition, voluntary or involuntary, by operation of law or otherwise and, as a verb, voluntarily or involuntarily, by operation of law or otherwise, to transfer, sell, assign, exchange, charge, pledge, give, hypothecate, convey, encumber or otherwise dispose of.

"**Withdrawing Member**" shall have the meaning provided in Section 12.5(b).

## EXHIBIT C
## Major Decisions

With respect to the Company and any Subsidiary, each of the below actions and/or decisions shall constitute a "**Major Decision**".

a.   Entering into Development Agreement and any amendments, modifications, renewals or replacement thereof;

b.   Sale or refinancing of any of the Properties or Project and any material amendments, modifications, renewals or replacement thereof;

c.   Approval of a material change of the purpose of or scope of the Company;

d.   Entering into any industrial leases for the Properties, or any brokerage company retained in connection therewith;

e.   Approval for attaching any liens or encumbrances on the Company assets;

f.   Approval of the execution of a Confession of Judgment against the Company;

g.   Settling any claim in excess of $100,000 against the Company;

h.   Acquiring any additional real property (other than the Land) or any interest therein on behalf of the Company;

i.   Doing any act in contravention of the purpose of this Agreement as provided in Section 3; or

j.   The taking of any action under applicable bankruptcy, insolvency or similar laws with respect to the Company or the Project.

## EXHIBIT D
### Buy/Sell

After the Lockout Period, at any time after a Deadlocked Major Decision shall have occurred, except in the case of a Deadlocked Major Decision with respect to the matters set forth in Section 9.10 herein, and the Members shall have unsuccessfully attempted to resolve the same in accordance with Section 9.2(f) above, either Member shall have the unilateral right to trigger this Buy/Sell provision (the "**Buy/Sell**"), by delivery of notice (the "**Buy/Sell Offering Notice**"). In the event of a Buy/Sell, the following provisions shall apply:

(a)     The Member sending the Buy/Sell Offering Notice shall be known as the "**Buy/Sell Initiator**" and the Member receiving it shall be known as the "**Buy/Sell Respondent**." The Buy/Sell Offering Notice shall include a valuation stating the aggregate dollar amount (the "**Buy/Sell Valuation**") that the Buy/Sell Initiator would be willing to pay if it were a third party for all of the Company Assets as of that date free and clear of all liabilities on such assets.

(b)     Upon receipt of the Buy/Sell Offering Notice, the Buy/Sell Respondent shall have the obligation to choose one of the following:

(c)     to sell its full Interest to the Buy/Sell Initiator for an amount equal to the aggregate amount the Buy/Sell Respondent would have been entitled to receive if the Company sold the Company Assets for the Buy/Sell Valuation and paid all the Company's liabilities (and liabilities secured by the Company Assets) on the Buy/Sell Closing Date and the Company distributed the resulting net proceeds (after deducting, inter alia, the amount of transaction costs (including brokerage commissions (2% of the purchase price) and transfer taxes (in accordance with applicable New York law)) that would have been incurred in connection with such sale and the extinguishment of all existing indebtedness and liabilities) in accordance with this Agreement; or

(d)     to purchase the full Interest of the Buy/Sell Initiator for an amount equal to the amount the Buy/Sell Initiator would have been entitled to receive if the Company sold the Company Assets for the Buy/Sell Valuation and paid all the Company's liabilities (and liabilities secured by the Company Assets) on the Buy/Sell Closing Date and the Company distributed the resulting net proceeds (after deducting, inter alia, the amount of transaction costs (including brokerage commissions (2% of the purchase price) and transfer taxes (in accordance with applicable New York law)) that would have been incurred in connection with such sale and the extinguishment of all existing indebtedness and liabilities) in accordance with this Agreement.

(e)     Within 30 days after receipt of the Buy/Sell Offering Notice by the Buy/Sell Respondent (the "**Buy/Sell Option Period**"), the Buy/Sell Respondent shall notify the Buy/Sell Initiator in writing as to whether (i) the Buy/Sell Respondent will elect to purchase the Interests of the Buy/Sell Initiator at the price provided for above (a "**Buy/Sell Purchase Notice**"), or (ii) will elect to sell its Interests in the Company to the Buy/Sell Initiator at the price provided for above (a "**Buy/Sell Sale Notice**").  If the Buy/Sell Respondent does not notify the Buy/Sell Initiator of its election prior to expiration of the Buy/Sell Option Period, the Buy/Sell Respondent shall for all purposes be conclusively deemed to have sent a Buy/Sell Sale Notice on the last day of such period. To be effective, a Buy/Sell Purchase Notice shall be accompanied by a deposit paid in United States Dollars by wire transfer of immediately available funds to Royal Abstract, as escrow agent,

or such other title company as reasonably selected by the parties, (the "**Buy/Sell Deposit**") in an amount equal to five percent (5%) of the purchase price for the Interests in question.  If the Buy/Sell Respondent delivers (or is deemed to have delivered) a Buy/Sell Sale Notice to the Buy/Sell Initiator as set forth above, the Buy/Sell Initiator shall have three (3) Business Days after the date of its actual or deemed receipt of the Buy/Sell Sale Notice to deliver the Buy/Sell Deposit.

(f)     The Member obligated to purchase hereunder shall fix a date (the "Buy/Sell Closing Date") upon which the closing of such purchase (the "**Buy/Sell Closing**") shall occur, which date shall not be sooner than 30 days, or later than 180 days, following the expiration of the Buy/Sell Option Period (with each Member having the one time right to adjourn such closing by up to five Business Days).  The Buy/Sell Closing shall take place at a location in the United States as designated by the Member that is obligated to purchase pursuant to this Section, or may take place escrow, at the request of either party.  The Buy/Sell Deposit (if in the form of a cash deposit) shall be released from escrow and credited toward the purchase price of the Interest being sold at the Buy/Sell Closing.

(g)     At the Buy/Sell Closing, (i) the selling Member shall deliver an assignment (in form and substance reasonably satisfactory to the buying Member) of the selling Member's Interest, which Interest shall be conveyed to the buying Member free and clear of all liens, claims and encumbrances (except for those created by this Agreement); (ii) the buying Member shall pay the purchase price (as determined above) for the selling Member's Interest (less the Buy/Sell Deposit, which shall be paid to the selling Member) to the selling Member by wire transfer of immediately available funds to an account or accounts designated by the selling Member; (iii) each party shall execute and deliver any other reasonable and customary documents and instruments as are required to effectuate such purchase and sale; (iv) the selling Member shall deliver to the buying Member (x) evidence reasonably satisfactory to the buying Member of the due corporate, partnership, limited liability company or other authority of such selling Member to convey its interest to the buying Member and (y) a certificate containing representations and warranties of such selling Member regarding (A) the due authorization, execution and delivery of the closing documents, (B) due formation, valid existence and good standing in all applicable jurisdictions, (C) the enforceability of the closing documents being signed by such selling Member, (D) that all consents and approvals necessary to be obtained with respect to the transaction in respect only of such selling Member have been obtained, (E) that the selling Member has not dealt with any brokers, finders or similar parties in connection with the sale that could entitle any such party to claim a commission, fee or other compensation in connection therewith (or, if there are any such brokers, finders or similar parties, that same have been or will be paid in full concurrently with the Buy/Sell Closing) and (F) that the selling Member's Interest is free from all liens, claims or encumbrances, which representations and warranties contained in such certificate shall survive the Buy/Sell Closing for a period of twelve (12) months; (v) each party shall pay its own legal fees in connection with such sale and purchase; the selling Member shall pay any transfer or similar taxes in connection with such sale and purchase; and all other costs involved in the transaction shall be paid equally by the selling Member and the buying Member; and (vi) such sale shall be subject to all liabilities and obligations of the Company, matured or unmatured, absolute or contingent.  The buying Member shall also be required to obtain a release of the selling Member and its Affiliates from obligations and liabilities that accrue after the date of such release under any guaranties that the selling Member and such Affiliates have provided to third parties in connection with any Company (or Subsidiary) financing.

(h)    If the selling Member breaches its obligations hereunder, then the buying Member shall be entitled to all rights and remedies at law or in equity on account thereof (including specific performance but excluding the right to obtain consequential or punitive damages) and the selling Member shall have no further right to invoke the provisions of this Exhibit D.  If the buying Member breaches its obligations under this Exhibit D, then (i) the selling Member shall be entitled to retain the Buy/Sell Deposit as liquidated damages, (ii) the buying Member shall have no further right to invoke the provisions of this Exhibit D, and (iii) the selling Member shall have the right to effectuate a Sale of the Properties without first implementing the provisions of this Exhibit D above and without the approval of the buying Member.  The parties acknowledge that it would be impractical and extremely difficult to estimate the damages which the selling Member may suffer in connection with a default by the buying Member hereunder.  Therefore, the parties have agreed that a reasonable estimate of the total net detriment that the selling Member would suffer in such event is and shall be the right of the selling Member to receive the Buy/Sell Deposit as liquidated damages, as its sole and exclusive remedy hereunder.  Such liquidated damages are not intended as a forfeiture or penalty within the meaning of applicable law.

(i)    In connection with the Buy/Sell Closing, the buying Member, at its sole cost, expense and liability, shall have the right to refinance any outstanding third party indebtedness of the Company (and the selling Member will reasonably cooperate with the buying Member in connection therewith at no liability, cost or expense to the selling Member); provided, however, that (i) the buying Member may not incur any liabilities, costs or expenses on behalf of the Company in connection with such refinancing (except for any liabilities, costs or expenses incurred upon or after the Buy/Sell Closing), and (ii) if for any reason such refinancing is not consummated, then the buying Member shall indemnify and hold the Company and the selling Member harmless from and against any and all claims, liabilities, costs and expenses (including commitment and other loan fees and attorneys' fees) suffered or incurred by the Company and/or the selling Member in connection with such refinancing or the failure of it to close.

(j)    Notwithstanding any of the forgoing, Plymouth may not exercise the Buy/Sell. If Dynamic is the buying Member hereunder, the percentage interest of Plymouth shall remain the same. If Namdar is the buying member hereunder, Namdar's purchase of the Membership Interests of Dynamic shall include the purchase of the membership Interests of Plymouth, in accordance with the provisions set forth herein.

Exhibit D

## EXHIBIT E
## Initial Budget and Plan

## **EXHIBIT F**

## **CERTIFICATE**